# LOCKE, GOVERNOR OF WASHINGTON, ET AL. *v.* DAVEY

No. 02–1315.   Argued December 2, 2003—Decided February 25, 2004

REHNQUIST, C. J., delivered the opinion of the Court, in which STE-VENS, O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *post*, p. 726. THOMAS, J., filed a dissenting opinion, *post*, p. 734.

*Narda Pierce*, Solicitor General of Washington, argued the cause for petitioners. With her on the briefs were *Christine O. Gregoire*, Attorney General, *William Berggren Collins*,

Senior Assistant Attorney General, and *Michael J. Shinn*, Assistant Attorney General.

*Jay Alan Sekulow* argued the cause for respondent. With him on the brief were *Stuart J. Roth, Colby M. May, James M. Henderson, Sr., Walter M. Weber, David A. Cortman, Alan E. Sears,* and *Benjamin W. Bull.*

*Solicitor General Olson* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Assistant Attorney General Acosta, Deputy Solicitor General Clement, Gregory G. Garre, David K. Flynn,* and *Eric W. Treene.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Vermont et al. by *William H. Sorrell,* Attorney General of Vermont, and *Timothy B. Tomasi,* Chief Assistant Attorney General, by *Anabelle Rodríguez,* Secretary of Justice of Puerto Rico, and by the Attorneys General for their respective jurisdictions as follows: *Thomas F. Reilly* of Massachusetts, *Jeremiah W. (Jay) Nixon* of Missouri, *Hardy Myers* of Oregon, *Lawrence E. Long* of South Dakota, and *Clyde Lemons, Jr.,* of the Northern Mariana Islands; for the American Civil Liberties Union et al. by *Aaron H. Caplan, Steven R. Shapiro, Julie E. Sternberg, Ayesha N. Khan, Elliot M. Mincberg,* and *Susan L. Sommer;* for the American Jewish Congress et al. by *Marc D. Stern, K. Hollyn Hollman, Jeffrey Sinensky, Kara Stein,* and *David Strom;* for the Anti-Defamation League et al. by *David Lash, Steven M. Freeman, Steven C. Sheinberg, Martin E. Karlinsky, Erwin Chemerinsky,* and *Frederick M. Lawrence;* for the National Education Association by *Robert H. Chanin, Andrew D. Roth,* and *Laurence Gold;* and for the National School Boards Association et al. by *David H. Remes* and *Julie Underwood.*

Briefs of *amici curiae* urging affirmance were filed for the State of Alabama by *William H. Pryor, Jr.,* Attorney General of Alabama, *Nathan A. Forrester,* Solicitor General, and *Margaret L. Fleming,* Assistant Attorney General; for the State of Florida et al. by *Charles J. Crist, Jr.,* Attorney General of Florida, *Christopher M. Kise,* Solicitor General, *Raquel A. Rodriguez,* and *Daniel Woodring;* for the State of Texas et al. by *Greg Abbott,* Attorney General of Texas, *Barry R. McBee,* First Assistant Attorney General, *Edward D. Burbach,* Deputy Attorney General, *Rafael Edward Cruz,* Solicitor General, *Joseph D. Hughes* and *Cassandra Robertson,* Assistant Solicitors General, *Mike Moore,* Attorney General of Mississippi, and *Mark L. Shurtleff,* Attorney General of Utah; for the Associa-

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The State of Washington established the Promise Scholarship Program to assist academically gifted students with postsecondary education expenses. In accordance with the State Constitution, students may not use the scholarship at an institution where they are pursuing a degree in devotional theology. We hold that such an exclusion from an otherwise inclusive aid program does not violate the Free Exercise Clause of the First Amendment.

The Washington State Legislature found that "[s]tudents who work hard . . . and successfully complete high school with high academic marks may not have the financial ability to attend college because they cannot obtain financial aid or the financial aid is insufficient." Wash. Rev. Code Ann. § 28B.119.005 (West Supp. 2004). In 1999, to assist these high-achieving students, the legislature created the

tion of Southern Baptist Colleges and Schools et al. by *Carter G. Phillips, Gene C. Schaerr,* and *Nicholas P. Miller;* for the Becket Fund for Religious Liberty et al. by *Kevin J. Hasson, Roman P. Storzer,* and *Anthony R. Picarello, Jr.;* for the Black Alliance for Educational Options by *Samuel Estreicher* and *Brett M. Schuman;* for the Council for Christian Colleges & Universities et al. by *Gregory S. Baylor* and *Thomas C. Berg;* for the Fairness Foundation by *Kenneth W. Starr, Robert R. Gasaway,* and *Ashley C. Parrish;* for the Institute for Justice et al. by *Richard D. Komer, Clint Bolick,* and *William H. Mellor;* for the Landmark Legal Foundation by *Richard P. Hutchison* and *Michael J. O'Neill;* for Liberty Counsel by *Mathew D. Staver* and *Rena M. Lindevaldsen;* for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin, Dennis Rapps, David Zwiebel, Richard B. Stone,* and *Nathan J. Diament;* for the National Legal Foundation by *Barry C. Hodge;* for the Solidarity Center for Law and Justice, P. C., by *James P. Kelly III;* and for Teresa M. Becker by *Richard Thompson.*

Briefs of *amici curiae* were filed for the Common Good Legal Defense Fund et al. by *John G. Stepanovich* and *Keith A. Fournier;* for the United States Conference of Catholic Bishops et al. by *Mark E. Chopko* and *Jeffrey Hunter Moon;* and for Robert S. Alley et al. by *Steven K. Green.*

Promise Scholarship Program, which provides a scholarship, renewable for one year, to eligible students for postsecondary education expenses. Students may spend their funds on any education-related expense, including room and board. The scholarships are funded through the State's general fund, and their amount varies each year depending on the annual appropriation, which is evenly prorated among the eligible students. Wash. Admin. Code § 250–80–050(2) (2003). The scholarship was worth $1,125 for academic year 1999–2000 and $1,542 for 2000–2001.

To be eligible for the scholarship, a student must meet academic, income, and enrollment requirements. A student must graduate from a Washington public or private high school and either graduate in the top 15% of his graduating class, or attain on the first attempt a cumulative score of 1,200 or better on the Scholastic Assessment Test I or a score of 27 or better on the American College Test. §§ 250–80–020(12)(a) to (d). The student's family income must be less than 135% of the State's median. § 250–80–020(12)(e). Finally, the student must enroll "at least half time in an eligible postsecondary institution in the state of Washington," and may not pursue a degree in theology at that institution while receiving the scholarship. §§ 250–80–020(12)(f) to (g); see also Wash. Rev. Code Ann. § 28B.10.814 (West 1997) ("No aid shall be awarded to any student who is pursuing a degree in theology"). Private institutions, including those religiously affiliated, qualify as " '[e]ligible postsecondary institution[s]' " if they are accredited by a nationally recognized accrediting body. See Wash. Admin. Code § 250–80–020(13). A "degree in theology" is not defined in the statute, but, as both parties concede, the statute simply codifies the State's constitutional prohibition on providing funds to students to pursue degrees that are "devotional in nature or designed to induce religious faith." Brief for Petitioners 6; Brief for Respondent 8; see also Wash. Const., Art. I, § 11.

A student who applies for the scholarship and meets the academic and income requirements is notified that he is eligible for the scholarship if he meets the enrollment requirements. *E. g.*, App. 95. Once the student enrolls at an eligible institution, the institution must certify that the student is enrolled at least half time and that the student is not pursuing a degree in devotional theology. The institution, rather than the State, determines whether the student's major is devotional. *Id.*, at 126, 131. If the student meets the enrollment requirements, the scholarship funds are sent to the institution for distribution to the student to pay for tuition or other educational expenses. See Wash. Admin. Code § 250–80–060.

Respondent, Joshua Davey, was awarded a Promise Scholarship, and chose to attend Northwest College. Northwest is a private, Christian college affiliated with the Assemblies of God denomination, and is an eligible institution under the Promise Scholarship Program. Davey had "planned for many years to attend a Bible college and to prepare [himself] through that college training for a lifetime of ministry, specifically as a church pastor." App. 40. To that end, when he enrolled in Northwest College, he decided to pursue a double major in pastoral ministries and business management/administration. *Id.*, at 43. There is no dispute that the pastoral ministries degree is devotional and therefore excluded under the Promise Scholarship Program.

At the beginning of the 1999–2000 academic year, Davey met with Northwest's director of financial aid. He learned for the first time at this meeting that he could not use his scholarship to pursue a devotional theology degree. He was informed that to receive the funds appropriated for his use, he must certify in writing that he was not pursuing such a degree at Northwest.[1] He refused to sign the form and did not receive any scholarship funds.

---

[1] The State does not require students to certify anything or sign any forms. App. 86, 89.

Davey then brought an action under Rev. Stat. § 1979, 42 U. S. C. § 1983, against various state officials (hereinafter State) in the District Court for the Western District of Washington to enjoin the State from refusing to award the scholarship solely because a student is pursuing a devotional theology degree, and for damages. He argued the denial of his scholarship based on his decision to pursue a theology degree violated, *inter alia*, the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment, as incorporated by the Fourteenth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. After the District Court denied Davey's request for a preliminary injunction, the parties filed cross-motions for summary judgment. The District Court rejected Davey's constitutional claims and granted summary judgment in favor of the State.

A divided panel of the United States Court of Appeals for the Ninth Circuit reversed. 299 F. 3d 748 (2002). The court concluded that the State had singled out religion for unfavorable treatment and thus under our decision in *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520 (1993), the State's exclusion of theology majors must be narrowly tailored to achieve a compelling state interest. 299 F. 3d, at 757–758. Finding that the State's own antiestablishment concerns were not compelling, the court declared Washington's Promise Scholarship Program unconstitutional. *Id.,* at 760. We granted certiorari, 538 U. S. 1031 (2003), and now reverse.

The Religion Clauses of the First Amendment provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." These two Clauses, the Establishment Clause and the Free Exercise Clause, are frequently in tension. See *Norwood* v. *Harrison,* 413 U. S. 455, 469 (1973) (citing *Tilton* v. *Richardson,* 403 U. S. 672, 677 (1971)). Yet we have long said that "there is room for play in the joints" between them. *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664, 669 (1970). In

other words, there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause.

This case involves that "play in the joints" described above. Under our Establishment Clause precedent, the link between government funds and religious training is broken by the independent and private choice of recipients. See *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 652 (2002); *Zobrest* v. *Catalina Foothills School Dist.*, 509 U. S. 1, 13–14 (1993); *Witters* v. *Washington Dept. of Servs. for Blind*, 474 U. S. 481, 487 (1986); *Mueller* v. *Allen*, 463 U. S. 388, 399–400 (1983). As such, there is no doubt that the State could, consistent with the Federal Constitution, permit Promise Scholars to pursue a degree in devotional theology, see *Witters, supra*, at 489, and the State does not contend otherwise. The question before us, however, is whether Washington, pursuant to its own constitution,[2] which has been authoritatively interpreted as prohibiting even indirectly funding religious instruction that will prepare students for the ministry, see *Witters* v. *State Comm'n for the Blind*, 112 Wash. 2d 363, 369–370, 771 P. 2d 1119, 1122 (1989) (en banc); cf. *Witters* v. *State Comm'n for the Blind*, 102 Wash. 2d 624, 629, 689 P. 2d 53, 56 (1984) (en banc) ("It is not the role of the State to pay for the religious education of future ministers"), rev'd, 474 U. S. 481 (1986), can deny them such funding without violating the Free Exercise Clause.

---

[2] The relevant provision of the Washington Constitution, Art. I, § 11, states:

"Religious Freedom. Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment."

Davey urges us to answer that question in the negative. He contends that under the rule we enunciated in *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah, supra,* the program is presumptively unconstitutional because it is not facially neutral with respect to religion.[3] We reject his claim of presumptive unconstitutionality, however; to do otherwise would extend the *Lukumi* line of cases well beyond not only their facts but their reasoning. In *Lukumi,* the city of Hialeah made it a crime to engage in certain kinds of animal slaughter. We found that the law sought to suppress ritualistic animal sacrifices of the Santeria religion. 508 U. S., at 535. In the present case, the State's disfavor of religion (if it can be called that) is of a far milder kind. It imposes neither criminal nor civil sanctions on any type of religious service or rite. It does not deny to ministers the right to participate in the political affairs of the community. See *McDaniel* v. *Paty,* 435 U. S. 618 (1978). And it does not require students to choose between their religious beliefs and

---

[3] Davey, relying on *Rosenberger* v. *Rector and Visitors of Univ. of Va.,* 515 U. S. 819 (1995), contends that the Promise Scholarship Program is an unconstitutional viewpoint restriction on speech. But the Promise Scholarship Program is not a forum for speech. The purpose of the Promise Scholarship Program is to assist students from low- and middle-income families with the cost of postsecondary education, not to "'encourage a diversity of views from private speakers.'" *United States* v. *American Library Assn., Inc.,* 539 U. S. 194, 206 (2003) (plurality opinion) (quoting *Rosenberger, supra,* at 834). Our cases dealing with speech forums are simply inapplicable. See *American Library Assn., supra; Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.,* 473 U. S. 788, 805 (1985).

Davey also argues that the Equal Protection Clause protects against discrimination on the basis of religion. Because we hold, *infra,* at 725, that the program is not a violation of the Free Exercise Clause, however, we apply rational-basis scrutiny to his equal protection claims. *Johnson* v. *Robison,* 415 U. S. 361, 375, n. 14 (1974); see also *McDaniel* v. *Paty,* 435 U. S. 618 (1978) (reviewing religious discrimination claim under the Free Exercise Clause). For the reasons stated herein, the program passes such review.

receiving a government benefit.[4]   See *ibid.; Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136 (1987); *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707 (1981); *Sherbert v. Verner*, 374 U. S. 398 (1963).   The State has merely chosen not to fund a distinct category of instruction.

JUSTICE SCALIA argues, however, that generally available benefits are part of the "baseline against which burdens on religion are measured."   *Post,* at 726 (dissenting opinion). Because the Promise Scholarship Program funds training for all secular professions, JUSTICE SCALIA contends the State must also fund training for religious professions.   See *post,* at 726–727.   But training for religious professions and training for secular professions are not fungible.   Training someone to lead a congregation is an essentially religious endeavor.   Indeed, majoring in devotional theology is akin to a religious calling as well as an academic pursuit.   See *Calvary Bible Presbyterian Church v. Board of Regents*, 72 Wash. 2d 912, 919, 436 P. 2d 189, 193 (1967) (en banc) (holding public funds may not be expended for "that category of instruction that resembles worship and manifests a devotion to religion and religious principles in thought, feeling, belief, and conduct"); App. 40 (Davey stating his "religious beliefs [were] the only reason for [him] to seek a college degree"). And the subject of religion is one in which both the United States and state constitutions embody distinct views—in favor of free exercise, but opposed to establishment—that find no counterpart with respect to other callings or professions.   That a State would deal differently with religious education for the ministry than with education for other callings is a product of these views, not evidence of hostility toward religion.

---

[4] Promise Scholars may still use their scholarship to pursue a secular degree at a different institution from where they are studying devotional theology.

Even though the differently worded Washington Constitution draws a more stringent line than that drawn by the United States Constitution, the interest it seeks to further is scarcely novel. In fact, we can think of few areas in which a State's antiestablishment interests come more into play.[5] Since the founding of our country, there have been popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an "established" religion.[6] See R. Butts, The American Tradition in Religion and Education 15–17, 19–20, 26–37 (1950); F. Lambert, The Founding Fathers and the Place of Religion in America 188 (2003) ("In defending their religious liberty against overreaching clergy, Americans in all regions found that Radical Whig ideas best framed their argument that state-supported clergy undermined liberty of conscience and should be opposed"); see also J. Madison, Memorial and Remonstrance Against Religious Assessments, reprinted in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 65, 68 (1947)

---

[5] JUSTICE SCALIA notes that the State's "philosophical preference" to protect individual conscience is potentially without limit, see *post*, at 730; however, the only interest at issue here is the State's interest in not funding the religious training of clergy. Nothing in our opinion suggests that the State may justify any interest that its "philosophical preference" commands.

[6] Perhaps the most famous example of public backlash is the defeat of "A Bill Establishing A Provision for Teachers of the Christian Religion" in the Virginia Legislature. The bill sought to assess a tax for "Christian teachers," reprinted in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1, 72, 74 (1947) (supplemental appendix to dissent of Rutledge, J.); see also *Rosenberger, supra*, at 853 (THOMAS, J., concurring) (purpose of the bill was to support "clergy in the performance of their function of teaching religion"), and was rejected after a public outcry. In its stead, the "Virginia Bill for Religious Liberty," which was originally written by Thomas Jefferson, was enacted. This bill guaranteed "that no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever." A Bill for Establishing Religious Freedom, reprinted in 2 Papers of Thomas Jefferson 546 (J. Boyd ed. 1950).

(appendix to dissent of Rutledge, J.) (noting the dangers to civil liberties from supporting clergy with public funds).

Most States that sought to avoid an establishment of religion around the time of the founding placed in their constitutions formal prohibitions against using tax funds to support the ministry. *E. g.,* Ga. Const., Art. IV, §5 (1789), reprinted in 2 Federal and State Constitutions, Colonial Charters, and Other Organic Laws 789 (F. Thorpe ed. 1909) (reprinted 1993) ("All persons shall have the free exercise of religion, without being obliged to contribute to the support of any religious profession but their own"); Pa. Const., Art. II (1776), in 5 *id.,* at 3082 ("[N]o man ought or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any ministry, contrary to, or against, his own free will and consent"); N. J. Const., Art. XVIII (1776), in *id.,* at 2597 (similar); Del. Const., Art. I, §1 (1792), in 1 *id.,* at 568 (similar); Ky. Const., Art. XII, §3 (1792), in 3 *id.,* at 1274 (similar); Vt. Const., Ch. I, Art. 3 (1793), in 6 *id.,* at 3762 (similar); Tenn. Const., Art. XI, §3 (1796), in *id.,* at 3422 (similar); Ohio Const., Art. VIII, §3 (1802), in 5 *id.,* at 2910 (similar). The plain text of these constitutional provisions prohibited *any* tax dollars from supporting the clergy. We have found nothing to indicate, as JUSTICE SCALIA contends, *post,* at 728, n. 1, that these provisions would not have applied so long as the State equally supported other professions or if the amount at stake was *de minimis.* That early state constitutions saw no problem in explicitly excluding *only* the ministry from receiving state dollars reinforces our conclusion that religious instruction is of a different ilk.[7]

---

[7] The *amici* contend that Washington's Constitution was born of religious bigotry because it contains a so-called "Blaine Amendment," which has been linked with anti-Catholicism. See Brief for United States as *Amicus Curiae* 23, n. 5; Brief for Becket Fund for Religious Liberty et al. as *Amici Curiae;* see also *Mitchell* v. *Helms,* 530 U. S. 793, 828 (2000) (plurality opinion). As the State notes and Davey does not dispute,

Far from evincing the hostility toward religion which was manifest in *Lukumi*, we believe that the entirety of the Promise Scholarship Program goes a long way toward including religion in its benefits.[8] The program permits students to attend pervasively religious schools, so long as they are accredited. As Northwest advertises, its "concept of education is distinctly Christian in the evangelical sense." App. 168. It prepares *all* of its students, "through instruction, through modeling, [and] through [its] classes, to use . . . the Bible as their guide, as the truth," no matter their chosen

---

however, the provision in question is not a Blaine Amendment. Tr. of Oral Arg. 5; see Reply Brief for Petitioners 6–7. The enabling Act of 1889, which authorized the drafting of the Washington Constitution, required the state constitution to include a provision "for the establishment and maintenance of systems of public schools, which shall be . . . free from sectarian control." Act of Feb. 22, 1889, ch. 180, §4, ¶ Fourth, 25 Stat. 676. This provision was included in Article IX, §4, of the Washington Constitution ("All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence"), and is not at issue in this case. Neither Davey nor *amici* have established a credible connection between the Blaine Amendment and Article I, §11, the relevant constitutional provision. Accordingly, the Blaine Amendment's history is simply not before us.

[8] Washington has also been solicitous in ensuring that its constitution is not hostile toward religion, see *State ex rel. Gallwey v. Grimm*, 146 Wash. 2d 445, 470, 48 P. 3d 274, 286 (2002) (en banc) ("[I]t was never the intention that our constitution should be construed in any manner indicating any hostility toward religion" (internal quotation marks omitted)), and at least in some respects, its constitution provides greater protection of religious liberties than the Free Exercise Clause, see *First Covenant Church of Seattle v. Seattle*, 120 Wash. 2d 203, 223–229, 840 P. 2d 174, 186–188 (1992) (en banc) (rejecting standard in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U. S. 872 (1990), in favor of more protective rule); *Munns v. Martin*, 131 Wash. 2d 192, 201, 930 P. 2d 318, 322 (1997) (en banc) (holding a city ordinance that imposed controls on demolition of historic structures inapplicable to the Catholic Church's plan to demolish an old school building and build a new pastoral center because the facilities are intimately associated with the church's religious mission). We have found nothing in Washington's overall approach that indicates it "single[s] out" anyone "for special burdens on the basis of . . . religious calling," as JUSTICE SCALIA contends, *post*, at 731.

profession. *Id.*, at 169. And under the Promise Scholarship Program's current guidelines, students are still eligible to take devotional theology courses.[9] Davey notes all students at Northwest are required to take at least four devotional courses, "Exploring the Bible," "Principles of Spiritual Development," "Evangelism in the Christian Life," and "Christian Doctrine," Brief for Respondent 11, n. 5; see also App. 151, and some students may have additional religious requirements as part of their majors. Brief for Respondent 11, n. 5; see also App. 150–151.

In short, we find neither in the history or text of Article I, § 11, of the Washington Constitution, nor in the operation of the Promise Scholarship Program, anything that suggests animus toward religion.[10] Given the historic and substantial state interest at issue, we therefore cannot conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect.

Without a presumption of unconstitutionality, Davey's claim must fail. The State's interest in not funding the pursuit of devotional degrees is substantial and the exclusion of such funding places a relatively minor burden on Promise Scholars. If any room exists between the two Religion Clauses, it must be here. We need not venture further into this difficult area in order to uphold the Promise Scholarship Program as currently operated by the State of Washington.

The judgment of the Court of Appeals is therefore

*Reversed.*

---

[9] The State notes that it is an open question whether the Washington Constitution prohibits nontheology majors from taking devotional theology courses. At this point, however, the Program guidelines only exclude students who are pursuing a theology degree. Wash. Admin. Code § 250–80–020(12)(g) (2003).

[10] Although we have sometimes characterized the Establishment Clause as prohibiting the State from "disapprov[ing] of a particular religion or of religion in general," *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 532 (1993) (citing cases), for the reasons noted *supra,* the State has not impermissibly done so here.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.

In *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520 (1993), the majority opinion held that "[a] law burdening religious practice that is not neutral . . . must undergo the most rigorous of scrutiny," *id.*, at 546, and that "the minimum requirement of neutrality is that a law not discriminate on its face," *id.*, at 533. The concurrence of two Justices stated that "[w]hen a law discriminates against religion as such, . . . it automatically will fail strict scrutiny." *Id.*, at 579 (Blackmun, J., joined by O'CONNOR, J., concurring in judgment). And the concurrence of a third Justice endorsed the "noncontroversial principle" that "formal neutrality" is a "necessary conditio[n] for free-exercise constitutionality." *Id.*, at 563 (SOUTER, J., concurring in part and concurring in judgment). These opinions are irreconcilable with today's decision, which sustains a public benefits program that facially discriminates against religion.

I

We articulated the principle that governs this case more than 50 years ago in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947):

> "New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation." *Id.*, at 16 (emphasis deleted).

When the State makes a public benefit generally available, that benefit becomes part of the baseline against which burdens on religion are measured; and when the State withholds

that benefit from some individuals solely on the basis of religion, it violates the Free Exercise Clause no less than if it had imposed a special tax.

That is precisely what the State of Washington has done here. It has created a generally available public benefit, whose receipt is conditioned only on academic performance, income, and attendance at an accredited school. It has then carved out a solitary course of study for exclusion: theology. Wash. Rev. Code Ann. § 28B.119.010(8) (West Supp. 2004); Wash. Admin. Code § 250–80–020(12)(g) (2003). No field of study but religion is singled out for disfavor in this fashion. Davey is not asking for a special benefit to which others are not entitled. Cf. *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 453 (1988). He seeks only *equal* treatment—the right to direct his scholarship to his chosen course of study, a right every other Promise Scholar enjoys.

The Court's reference to historical "popular uprisings against procuring taxpayer funds to support church leaders," *ante*, at 722, is therefore quite misplaced. That history involved not the inclusion of religious ministers in public benefits programs like the one at issue here, but laws that singled them out for financial aid. For example, the Virginia bill at which Madison's Remonstrance was directed provided: "[F]or the support of Christian teachers . . . [a] sum payable for tax on the property within this Commonwealth, is hereby assessed . . . ." A Bill Establishing a Provision for Teachers of the Christian Religion (1784), reprinted in *Everson, supra,* at 72. Laws supporting the clergy in other States operated in a similar fashion. See S. Cobb, The Rise of Religious Liberty in America 131, 169, 270, 295, 304, 386 (1902). One can concede the Framers' hostility to funding the clergy *specifically*, but that says nothing about whether the clergy had to be excluded from benefits the State made available to all. No one would seriously contend, for example, that the Fram-

ers would have barred ministers from using public roads on their way to church.[1]

The Court does not dispute that the Free Exercise Clause places some constraints on public benefits programs, but finds none here, based on a principle of "'play in the joints.'" *Ante*, at 719. I use the term "principle" loosely, for that is not so much a legal principle as a refusal to apply *any* principle when faced with competing constitutional directives. There is nothing anomalous about constitutional commands that abut. A municipality hiring public contractors may not discriminate *against* blacks or *in favor of* them; it cannot discriminate a little bit each way and then plead "play in the joints" when haled into court. If the Religion Clauses demand neutrality, we must enforce them, in hard cases as well as easy ones.

Even if "play in the joints" were a valid legal principle, surely it would apply only when it was a close call whether complying with one of the Religion Clauses would violate the other. But that is not the case here. It is not just that "the State could, consistent with the Federal Constitution, permit Promise Scholars to pursue a degree in devotional

---

[1] Equally misplaced is the Court's reliance on founding-era state constitutional provisions that prohibited the use of tax funds to support the ministry. *Ante*, at 723. There is no doubt what these provisions were directed against: measures of the sort discussed earlier in text, singling out the clergy for public support. See *supra*, at 727. The Court offers no historical support for the proposition that they were meant to exclude clergymen from general benefits available to all citizens. In choosing to interpret them in that fashion, the Court needlessly gives them a meaning that not only is contrary to our Religion Clause jurisprudence, but has no logical stopping point short of the absurd. No State with such a constitutional provision has, so far as I know, ever prohibited the hiring of public employees who use their salary to conduct ministries, or excluded ministers from generally available disability or unemployment benefits. Since the Court cannot identify any instance in which these provisions were applied in such a discriminatory fashion, its appeal to their "plain text," *ante*, at 723, adds nothing whatever to the "plain text" of Washington's own Constitution.

theology." *Ibid.* The establishment question *would not even be close,* as is evident from the fact that this Court's decision in *Witters* v. *Washington Dept. of Servs. for Blind,* 474 U. S. 481 (1986), was unanimous. Perhaps some formally neutral public benefits programs are so gerrymandered and devoid of plausible secular purpose that they might raise specters of state aid to religion, but an evenhanded Promise Scholarship Program is not among them.

In any case, the State already has all the play in the joints it needs. There are any number of ways it could respect both its unusually sensitive concern for the conscience of its taxpayers *and* the Federal Free Exercise Clause. It could make the scholarships redeemable only at public universities (where it sets the curriculum), or only for select courses of study. Either option would replace a program that facially discriminates against religion with one that just happens not to subsidize it. The State could also simply abandon the scholarship program altogether. If that seems a dear price to pay for freedom of conscience, it is only because the State has defined that freedom so broadly that it would be offended by a program with such an incidental, indirect religious effect.

What is the nature of the State's asserted interest here? It cannot be protecting the pocketbooks of its citizens; given the tiny fraction of Promise Scholars who would pursue theology degrees, the amount of any citizen's tax bill at stake is *de minimis.* It cannot be preventing mistaken appearance of endorsement; where a State merely declines to penalize students for selecting a religious major, "[n]o reasonable observer is likely to draw . . . an inference that the State itself is endorsing a religious practice or belief." *Id.,* at 493 (O'CONNOR, J., concurring in part and concurring in judgment). Nor can Washington's exclusion be defended as a means of assuring that the State will neither favor nor disfavor Davey in his religious calling. Davey will throughout his life contribute to the public fisc through sales taxes on

personal purchases, property taxes on his home, and so on; and nothing in the Court's opinion turns on whether Davey winds up a net winner or loser in the State's tax-and-spend scheme.

No, the interest to which the Court defers is not fear of a conceivable Establishment Clause violation, budget constraints, avoidance of endorsement, or substantive neutrality—none of these. It is a pure philosophical preference: the State's opinion that it would violate taxpayers' freedom of conscience *not* to discriminate against candidates for the ministry. This sort of protection of "freedom of conscience" has no logical limit and can justify the singling out of religion for exclusion from public programs in virtually any context. The Court never says whether it deems this interest compelling (the opinion is devoid of any mention of standard of review) but, self-evidently, it is not.[2]

---

[2] The Court argues that those pursuing theology majors are not comparable to other Promise Scholars because "training for religious professions and training for secular professions are not fungible." *Ante*, at 721. That may well be, but all it proves is that the State has a *rational basis* for treating religion differently. If that is all the Court requires, its holding is contrary not only to precedent, see *supra*, at 726, but to common sense. If religious discrimination required only a rational basis, the Free Exercise Clause would impose no constraints other than those the Constitution already imposes on all government action. The question is not whether theology majors are different, but whether the differences are substantial enough to justify a discriminatory financial penalty that the State inflicts on no other major. Plainly they are not.

Equally unpersuasive is the Court's argument that the State may discriminate against theology majors in distributing public benefits because the Establishment Clause and its state counterparts are themselves discriminatory. See *ante*, at 721, 723. The Court's premise is true at some level of abstraction—the Establishment Clause discriminates against religion by singling it out as the one thing a State may not establish. All this proves is that a State has a compelling interest in not committing *actual* Establishment Clause violations. Cf. *Widmar* v. *Vincent*, 454 U. S. 263, 271 (1981). We have never inferred from this principle that a State has a constitutionally sufficient interest in discriminating against religion in whatever other context it pleases, so long as it claims some connection, however attenuated, to establishment concerns.

## II

The Court makes no serious attempt to defend the program's neutrality, and instead identifies two features thought to render its discrimination less offensive. The first is the lightness of Davey's burden. The Court offers no authority for approving facial discrimination against religion simply because its material consequences are not severe. I might understand such a test if we were still in the business of reviewing facially neutral laws that merely happen to burden some individual's religious exercise, but we are not. See *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872, 885 (1990). Discrimination *on the face of a statute* is something else. The indignity of being singled out for special burdens on the basis of one's religious calling is so profound that the concrete harm produced can never be dismissed as insubstantial. The Court has not required proof of "substantial" concrete harm with other forms of discrimination, see, *e. g., Brown* v. *Board of Education,* 347 U. S. 483, 493–495 (1954); cf. *Craig* v. *Boren,* 429 U. S. 190 (1976), and it should not do so here.

Even if there were some threshold quantum-of-harm requirement, surely Davey has satisfied it. The First Amendment, after all, guarantees *free* exercise of religion, and when the State exacts a financial penalty of almost $3,000 for religious exercise—whether by tax or by forfeiture of an otherwise available benefit—religious practice is anything *but* free. The Court's only response is that "Promise Scholars may still use their scholarship to pursue a secular degree at a different institution from where they are studying devotional theology." *Ante,* at 721, n. 4. But part of what makes a Promise Scholarship attractive is that the recipient can apply it to his *preferred* course of study at his *preferred* accredited institution. That is part of the "benefit" the State confers. The Court distinguishes our precedents only by swapping the benefit to which Davey was actually entitled (a scholarship for his chosen course of study) with another, less valuable one (a scholarship for any course of study *but* his chosen

one). On such reasoning, any facially discriminatory benefits program can be redeemed simply by redefining what it guarantees.

The other reason the Court thinks this particular facial discrimination less offensive is that the scholarship program was not motivated by animus toward religion. The Court does not explain why the legislature's motive matters, and I fail to see why it should. If a State deprives a citizen of trial by jury or passes an *ex post facto* law, we do not pause to investigate whether it was actually trying to accomplish the evil the Constitution prohibits. It is sufficient that the citizen's rights have been infringed. "[It does not] matter that a legislature consists entirely of the purehearted, if the law it enacts in fact singles out a religious practice for special burdens." *Lukumi*, 508 U. S., at 559 (SCALIA, J., concurring in part and concurring in judgment).

The Court has not approached other forms of discrimination this way. When we declared racial segregation unconstitutional, we did not ask whether the State had originally adopted the regime, not out of "animus" against blacks, but because of a well-meaning but misguided belief that the races would be better off apart. It was sufficient to note the current effect of segregation on racial minorities. See *Brown, supra,* at 493–495. Similarly, the Court does not excuse statutes that facially discriminate against women just because they are the vestigial product of a well-intentioned view of women's appropriate social role. See, *e. g., United States* v. *Virginia,* 518 U. S. 515, 549–551 (1996); *Adkins* v. *Children's Hospital of D. C.,* 261 U. S. 525, 552–553 (1923). We do sometimes look to legislative intent to smoke out more subtle instances of discrimination, but we do so as a *supplement* to the core guarantee of facially equal treatment, not as a replacement for it. See *Hunt* v. *Cromartie,* 526 U. S. 541, 546 (1999).

There is no need to rely on analogies, however, because we have rejected the Court's methodology in this very con-

text. In *McDaniel* v. *Paty*, 435 U. S. 618 (1978), we considered a Tennessee statute that disqualified clergy from participation in the state constitutional convention. That statute, like the one here, was based upon a state constitutional provision—a clause in the 1796 Tennessee Constitution that disqualified clergy from sitting in the legislature. *Id.*, at 621, and n. 1 (plurality opinion). The State defended the statute as an attempt to be faithful to its constitutional separation of church and state, and we accepted that claimed benevolent purpose as bona fide. See *id.*, at 628. Nonetheless, because it did not justify facial discrimination against religion, we invalidated the restriction. *Id.*, at 629.[3]

It may be that Washington's original purpose in excluding the clergy from public benefits was benign, and the same might be true of its purpose in maintaining the exclusion today. But those singled out for disfavor can be forgiven for suspecting more invidious forces at work. Let there be no doubt: This case is about discrimination against a religious minority. Most citizens of this country identify themselves as professing some religious belief, but the State's policy poses no obstacle to practitioners of only a tepid, civic version of faith. Those the statutory exclusion actually affects—those whose belief in their religion is so strong that they dedicate their study and their lives to its ministry—are a far narrower set. One need not delve too far into modern popular culture to perceive a trendy disdain for deep religious conviction. In an era when the Court is so quick to come to the aid of other disfavored groups, see, *e. g.*, *Romer* v. *Evans*, 517 U. S. 620, 635 (1996), its indifference in this case, which involves a form of discrimination to which the Constitution actually speaks, is exceptional.

---

[3] *McDaniel* had no opinion for the Court, but nothing in the separate opinions suggests disagreement over the issues relevant here. Cf. 435 U. S., at 636, n. 9 (Brennan, J., concurring in judgment) (noting dispute over statute's purpose but deeming it irrelevant).

.    \*    \*    \*

Today's holding is limited to training the clergy, but its logic is readily extendible, and there are plenty of directions to go. What next? Will we deny priests and nuns their prescription-drug benefits on the ground that taxpayers' freedom of conscience forbids medicating the clergy at public expense? This may seem fanciful, but recall that France has proposed banning religious attire from schools, invoking interests in secularism no less benign than those the Court embraces today. See Sciolino, Chirac Backs Law to Keep Signs of Faith Out of School, N. Y. Times, Dec. 18, 2003, p. A17, col. 1. When the public's freedom of conscience is invoked to justify denial of equal treatment, benevolent motives shade into indifference and ultimately into repression. Having accepted the justification in this case, the Court is less well equipped to fend it off in the future. I respectfully dissent.

JUSTICE THOMAS, dissenting.

Because the parties agree that a "degree in theology" means a degree that is "devotional in nature or designed to induce religious faith," Brief for Petitioners 6; Brief for Respondent 8, I assume that this is so for purposes of deciding this case. With this understanding, I join JUSTICE SCALIA's dissenting opinion. I write separately to note that, in my view, the study of theology does not necessarily implicate religious devotion or faith. The contested statute denies Promise Scholarships to students who pursue "a degree in theology." See Wash. Admin. Code § 250–80–020(12)(g) (2003) (defining an " '[e]ligible student,' " in part, as one who "[i]s not pursuing a degree in theology"); Wash. Rev. Code Ann. § 28B.10.814 (West 1997) ("No aid shall be awarded to any student who is pursuing a degree in theology"). But the statute itself does not define "theology." And the usual definition of the term "theology" is not limited to devotional studies. "Theology" is defined as "[t]he study of the nature

of God and religious truth" and the "rational inquiry into religious questions." American Heritage Dictionary 1794 (4th ed. 2000). See also Webster's Ninth New Collegiate Dictionary 1223 (1991) ("the study of religious faith, practice, and experience" and "the study of God and his relation to the world"). These definitions include the study of theology from a secular perspective as well as from a religious one.

Assuming that the State denies Promise Scholarships only to students who pursue a degree in devotional theology, I believe that JUSTICE SCALIA's application of our precedents is correct. Because neither party contests the validity of these precedents, I join JUSTICE SCALIA's dissent.