CLIFFORD, J.,
dissenting.
[¶ 66] Title 20-A M.R.S. § 5204(4) (2005) allows parents residing in towns that lack public school systems to choose the schools their children attend by providing for tuition to be paid to public or private schools in other municipalities. Prior to a 1983 amendment to Maine’s tuition statute, section 5204(4) was neutral toward religion, and families residing in towns without their own public schools enjoyed a unique opportunity to send their children to private schools, including sectarian schools. The system worked very well, and offered parents broad choices in the education of their children, choices otherwise enjoyed only by families of some economic means.[19]
[¶ 67] The tuition statute’s neutrality toward religion ended in the early 1980s, however, when 20-A M.R.S. § 2951(2) (2005) was enacted to limit those private schools approved for the receipt of public tuition funds to “nonsectarian school[s] in accordance with the First Amendment of the United States Constitution.” P.L. 1981, ch. 693, § 5. This amendment denied parents the opportunity to send their children to sectarian schools within the program established by section 5204(4). The amendment was enacted following an opinion issued by the Attorney General, and *963 was justified solely because it was thought at that time to be required by the Establishment Clause of the First Amendment to the United States Constitution. The amendment substantially altered a unique program that benefited Maine families.
[¶ 68] In Bagley v. Raymond School Department, the plaintiffs challenged the constitutionality of section 2951(2). 1999 ME 60, ¶ 1, 728 A.2d 127, 130, cert. denied, 528 U.S. 947, 120 S.Ct. 864, 145 L.Ed.2d 285 (1999). In rejecting that challenge, this Court concluded that the statute’s explicit discrimination against parents who desire to send their children to private sectarian schools was justified because, as the State contended, the prohibition on the payment of tuition for religious-affiliated schools was compelled by the Establishment Clause of the United States Constitution. Id. ¶ 33, 728 A.2d at 138. This Court stated:
[t]he State offers only one justification for the statute — an effort to comply with the Establishment Clause. Accordingly, it makes little difference whether we classify the level of scrutiny as strict or requiring only a rational basis. If the State’s justification is based on an erroneous understanding of the Establishment Clause, its justification will not withstand any level of scrutiny.
Id. ¶ 32, 728 A.2d at 137-38.
[¶ 69] Subsequent to this Court’s decision in Bagley, however, the United States Supreme Court concluded that tuition payments by a municipality that enable families to send their children to sectarian schools do not violate the Establishment Clause of the United States Constitution as long as the statutory program pursuant to which the payment is made is neutral as to religion, and the choice of the religious school is the free and independent decision of the parents. Zelman v. Simmons-Harris, 536 U.S. 639, 652, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002). Because the language of section 5204(4) is neutral as to religion, and does provide parents with the choice of the school their child will attend, it is abundantly clear from the decision in Zel-man that the Establishment Clause does not require the prohibitory language of section 2951(2). See Locke v. Davey, 540 U.S. 712, 719, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (citing Zelman, 536 U.S. at 652, 122 S.Ct. 2460).
[¶ 70] Relying on Locke, a United States Supreme Court case decided subsequent to Zelman, this Court concludes that, although it is clear that Maine could repeal section 2951(2) and again make section 5204(4) neutral as to religion, as it once was, and could reinstate tuition aid to parents who reside in towns without public schools and who choose to send their children to sectarian schools without violating the Establishment Clause, the elimination of the discriminatory provision of section 2951(2) is not required.
[¶ 71] Because this Court reads Locke as authorizing the explicit discrimination of section 2951(2), it applies a rational basis test to the equal protection claim of the plaintiffs, and accepts the State’s argument that there is a rational basis to justify the unequal treatment of parents who desire to send their children to sectarian schools expressed in section 2951. Because, in my view, this Court reads Locke far more broadly than it should, and applies the wrong test to determine whether section 2951(2) violates the Equal Protection Clause, I respectfully dissent.
[¶ 72] The State of Washington maintains a post-secondary scholarship program for academically gifted students. The Supreme Court concluded in Locke that the State of Washington could refuse to provide scholarship funds pursuant to that scholarship program to students who were pursuing training for the ministry without violating the Free Exercise Clause *964 of the United States Constitution. Locke, 540 U.S. at 721, 725, 124 S.Ct. 1307. In doing so, the Supreme Court stated that “there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause.” Id. at 718-19, 124 S.Ct. 1307.
[¶ 73] The decision in Locke upheld the prohibition of scholarship aid in unique circumstances not applicable to the present appeal. The specific scholarship at issue in Locke was for the study of the ministry, referred to by the Supreme Court as “training for religious professions,” and as a “distinct category of instruction.” Id. at 721, 124 S.Ct. 1307. Not all scholarship aid to sectarian schools was prohibited, and the Court noted that “[t]raining someone to lead a congregation is an essentially religious endeavor. Indeed, majoring in devotional theology is akin to a religious calling as well as an academic pursuit.” Id. The Court noted that in the State of Washington, there is a long history of opposition to the use of taxpayer funds to support the ministry and church leaders, and that the only interest at stake was the State’s interest in not funding the training of clergy. Id. at 722 & n. 5, 124 S.Ct. 1307. The Supreme Court stated that it could not “conclude that the denial of funding for vocational religious instruction alone is inherently constitutionally suspect ... [and that i]f any room exists between the two Religion Clauses, it must be here.” Id. at 725, 124 S.Ct. 1307.
[¶ 74] Contrary to the training for church ministry that was at issue in Locke, for which the provision of scholarship aid the Supreme Court held could be prohibited, section 5204(4) provides tuition aid for primary and secondary education, education that is compulsory for all students in Maine, and in no way constitutes the “training for religious professions” that uniquely limited the Supreme Court’s holding in Locke.
[¶ 75] Moreover, in the State of Washington, the prohibition on funding for education for the ministry is grounded in the State’s Constitution. Maine has no such constitutional prohibition. Indeed, until the early 1980s and prior to the existence of section 2951(2), which was enacted to comply with the then current understanding of the Establishment Clause of the First Amendment, section 5204 allowed tuition payments to parents who chose to send their children to sectarian schools.[20] Although Locke states that there is some “play in the joints” between what is permitted by the Establishment Clause and what is required by the Free Exercise Clause of the United States Constitution, Locke, 540 U.S. at 718-19, 124 S.Ct. 1307, the overt and broad discrimination in education mandated by section 2951(2) goes far beyond the limited restriction on funding for ministry training sanctioned by the Supreme Court in Locke, and constitutes more “play in the joints” than was recognized as legitimate in Locke. The prohibition on payment of tuition for sectarian secondary schools is not required by the Establishment Clause of the United States Constitution, and Locke should not be read as providing authority for the discriminatory language found in section 2951(2).
[¶ 76] In my view, section 2951(2) results in a denial of equal protection of the law pursuant to the Maine and Federal Constitutions. See U.S. Const, amend. XIV, § 1; Me. Const, art. 1, § 6-A. The disparate treatment mandated by section 2951(2) is based on religion, a most fundamental right, and requires that we apply the strict scrutiny standard to determine the legitimacy of the State’s action. Bagley, 1999 ME 60, ¶ 27, 728 A.2d at 136-37. Strict *965 scrutiny requires that the challenged action of the State be narrowly tailored to achieve a compelling governmental interest. Id. The compelling governmental interest that justified the enactment of section 2951(2), namely, that it was required to prevent section 5204(4) from violating the Establishment Clause, is no longer operative, and, accordingly, there is no longer any kind of compelling State interest that justifies the unequal treatment mandated by section 2951(2). Section 2951(2) can no longer withstand strict scrutiny analysis.
[¶ 77] Further, even if Locke is read more broadly than its language would seem to allow, and a rational relationship test is applied to the equal protection interests of the parents, there is no legitimate rationale that should be considered by the Court to justify the discrimination manifested in section 2951(2). The enactment of section 2951(2) was based solely on the conclusion that it was necessary to ensure compliance with the Establishment Clause. That was the only reason advanced by the State in Bagley to justify the discrimination in section 2951(2). Bagley, 1999 ME 60, ¶ 56, 728 A.2d at 144. The language of section 5204(4) making reference to the First Amendment remains unchanged. Because section 2951(2) is not required by the Establishment Clause, despite the fact that Bagley made clear the basis for the enactment of section 2951(2) and the issue on which the State relied in seeking to uphold section 2951(2), the State now advances, and the Court accepts, new, after-the-fact reasons to justify the discriminatory language of section 2951(2). Those reasons should be rejected.
[¶ 78] I agree that the State is not required to provide tuition aid to parents who wish to send their children to nonpublic schools. If it does provide such aid, however, it should not be able to exclude private schools that also happen to have a religious affiliation. In my view, that is blatant discrimination that reflects not a neutrality toward religion, but rather an animus against religion. As was said in Bagley, “[i]f the State’s justification [for the disparate treatment] is based on an erroneous understanding of the Establishment Clause, its justification will not withstand any level of scrutiny.” Id. ¶ 32, 728 A.2d at 138. The Establishment Clause is the only rationale that the State should be allowed to advance and that should be considered to justify the disparate treatment reflected in section 2951(2), and it does not.
[¶ 79] I would vacate the judgment of the Superior Court.

. Persuasive literature exists to indicate that school choice programs not only provide a good education to students, but also that they are cost effective as well. See, e.g., Brad P. Bender, Comment, "Allegiance to Our Children”: The School Choice Debate in the Commonwealth of Pennsylvania, 104 Dick. L. Rev. 165 (1999); Mark J. Beutler, Public Funding of Sectarian Education: Establishment and Free Exercise Clause Implications, 2 Geo. Ma son Ind. L. Rev. 7 (1993); Scott Fenton, Comment, School Voucher Programs: An Idea Whose Time Has Arrived, 26 Cap. U.L. Rev. 645 (1997); Krista Kafer, Article, School Choice in 2003: An Old Concept Gains New Life, 59 N.Y.U. Ann Surv. Am. L. 439 (2003); James A. Peyser, SYMPOSIUM: Issues in Education Law and Policy — School Choice: When, Not If, 35 B.C. L. Rev. 619 (1994).

. See Frank Heller, Lessons from Maine: Education Vouchers for Students Since 1873, Cato Inst. Briefing Papers (Cato Inst.), Sept. 10, 2001.