(Slip Opinion)

# Exclusion of Religiously Affiliated Schools from Charter-School Grant Program

A provision of the Elementary and Secondary Education Act of 1965 that excludes religiously affiliated charter schools from participating in the Expanding Opportunity Through Quality Charter Schools Program discriminates on the basis of religious status in violation of the Free Exercise Clause.

February 18, 2020

MEMORANDUM OPINION FOR THE
PRINCIPAL DEPUTY GENERAL COUNSEL
DEPARTMENT OF EDUCATION

You have asked about the constitutionality of a statute that excludes religiously affiliated charter schools from participating in the Expanding Opportunity Through Quality Charter Schools Program. We conclude that the restriction unconstitutionally discriminates on the basis of religious status under *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017).

The charter-school program was added to the Elementary and Secondary Education Act of 1965 ("ESEA"), Pub. L. No. 89-10, 79 Stat. 27, by the No Child Left Behind Act of 2001, Pub. L. No. 107-110, sec. 501, §§ 5201–5211, 115 Stat. 1425, 1788–1800 (2002). After further amendment, the program statute now appears at ESEA §§ 4301–4311, and is codified at 20 U.S.C. §§ 7221–7221j. The statute defines a "charter school" as a "public school" that is "exempt from significant State or local rules that inhibit the flexible operation and management of public schools," but that is nonetheless "operated under public supervision and direction." 20 U.S.C. § 7221i(2)(A)–(B). A charter school must be both "nonsectarian in its programs, admissions policies, employment practices, and all other operations" and "not affiliated with a sectarian school or religious institution." *Id.* § 7221i(2)(E). Under the program, the Department of Education provides grants to entities such as state educational agencies or charter-school support organizations. *Id.* § 7221b(a)–(b). These entities in turn make subgrants to "eligible applicants" so that they can create or operate charter schools. *Id.* § 7221b(b)(1). An "eligible applicant," or "developer," can be "an individual or group of individuals (including a public or private nonprofit organization)." *Id.* § 7221i(5)–(6).

1

Thus, while a "charter school" is a "public school" operated under "public supervision and direction," *id.* § 7221i(2)(B), it may be created or operated by an individual or private nonprofit organization.

You have asked whether the provision of the ESEA limiting eligibility for this program to schools "not affiliated with a sectarian school or religious institution," *id.* § 7221i(2)(E), violates the Free Exercise Clause of the First Amendment. Under Supreme Court precedent, the framework for analyzing that question depends on "whether the restriction is based upon an institution's religious status or whether it is based upon how the federal support would be used." *Religious Restrictions on Capital Financing for Historically Black Colleges and Universities*, 43 Op. O.L.C. __, at *6 (2019) ("*Religious Restrictions*"). That distinction derives from the Supreme Court's decisions in *Trinity Lutheran*, which struck down a Missouri policy "of denying grants to any applicant owned or controlled by a church, sect, or other religious entity," 137 S. Ct. at 2017, and *Locke v. Davey*, 540 U.S. 712 (2004), which upheld a Washington statute denying certain scholarship funds to "'any student who is pursuing a degree in theology,'" *id.* at 716 (quoting statute). The Court deemed the former restriction to be impermissible discrimination on the basis of religious status, but the latter to be a permissible limit on the use of public funds for explicitly devotional religious activity. *See Religious Restrictions*, 43 Op. O.L.C. __, at *5–6, *16–19.

As we have explained, the difference between status-based religious discrimination (which is presumptively unconstitutional) and use-based limits on allocating government benefits (which may be permissible under *Locke*) is informed by the distinction the Supreme Court has drawn between funding restrictions that permissibly define the scope of a government program and unconstitutional conditions on the use of federal funds. *Id.* at *6. While the government may "retain a legitimate interest in defining the program to exclude certain religious uses" of funds, it may not, as a general matter, create a religious-funding restriction so broad that "it sweeps beyond 'defining the limits of the federally funded program to defining the recipient.'" *Id.* at *7 (quoting *U.S. Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.* ("*AOSI*"), 570 U.S. 205, 218 (2013)).

In our *Religious Restrictions* opinion, we applied this framework to a statutory funding condition that denied federal loan support to capital-improvement projects at a university "'in which a substantial portion of

its functions is subsumed in a religious mission.'" *Id.* at *16–17 (quoting 20 U.S.C. § 1066c(c)). We concluded that the restriction was status-based religious discrimination. We reasoned that the condition denied federal support to "projects that have no direct connection to the religious activities of" a university "simply because of the religious mission of the institution"—even to projects that had no "inherent religious character." *Id.* at *17. This reasoning turned on the breadth of the restriction in question and its tenuous connection to the purpose of limiting funding to secular activities.

The religious-affiliation restriction in the ESEA broadly prohibits charter schools in the program from associating with religious organizations. No charter school may be "affiliated" with any "sectarian school or religious institution." 20 U.S.C. § 7221i(2)(E). Generally speaking, one entity is "affiliated" with another if the two have a close association, such as when they have formally distinct business operations but are under common ownership or control. *See Black's Law Dictionary* 67 (9th ed. 2009) (defining "affiliated," with reference to a corporation, to mean "related to another corporation by shareholdings or other means of control"); 1 *Oxford English Dictionary* 216 (2d ed. 1989) ("[t]o attach a smaller institution *to*, or connect it *with*, a larger one as a branch thereof"); *Webster's Third New International Dictionary* 35 (2002) (defining "affiliate" as "a company effectively controlled by another or associated with others under common ownership or control"); *accord Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009). The restriction therefore would not only prohibit a religious institution from owning or operating a charter school but also preclude the owners or operators of a charter school that otherwise satisfies federal requirements from closely associating with a religious institution.

That is discrimination on the basis of religious status. Like the provision discussed in our *Religious Restrictions* opinion, the categorical prohibition on religious affiliation in the charter-school program sweeps well beyond ensuring that the activities of the program in question remain nonsectarian. A religious institution would have to divest itself of its religious character before it could own or operate a charter school in the program. The restriction would also preclude the owners or operators of a secular charter school from expressing their religious beliefs through closely associating with a distinct religious organization. All that would

be true even if the religious institution and the charter school maintained separate operations, took care to preserve the nonsectarian character of the charter school's curriculum and operations, and submitted to public supervision and direction in operating the school. *See* 20 U.S.C. § 7221i(2)(E). The restriction therefore goes beyond assuring the nonsectarian character of the charter-school program itself. Instead, it is aimed at the religious character of individuals and organizations that seek to create, own, or operate nonsectarian charter schools run under public supervision.

The conclusion that this statute discriminates on the basis of religious status is underscored by unconstitutional-conditions cases involving the right to free speech. The Supreme Court has observed that the possibility of affiliating with other organizations sometimes permits "an organization bound by a funding condition to exercise its First Amendment rights outside the scope of the federal program." *AOSI*, 570 U.S. at 219. But here that is impossible, because the charter-school statute proscribes the act of affiliation itself. The prohibition on affiliation burdens the exercise of religion: it prohibits a related, but distinct, religious organization from participating in the program, and it prohibits those who own or operate charter schools from achieving a close association with such a religious organization. *Compare FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399–401 (1984) (striking down a provision of the Public Broadcasting Act of 1967 that prohibited television and radio stations from receiving certain grants from the Corporation for Public Broadcasting if they engaged in editorializing, because the statute did not permit a television or radio station to receive federal funds even if the station set up "a separate affiliate" to pursue its editorializing activities with non-federal funds), *with Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 544 & n.6 (1983) (rejecting a constitutional challenge to a provision of the Internal Revenue Code that denied tax-exempt status to a nonprofit organization that engaged in lobbying because the nonprofit organization could separately incorporate an affiliate to lobby and still be eligible for a tax exemption). It is one thing for the program to require the curriculum of a charter school to be nonsectarian. Because a charter school is under "public supervision and direction," 20 U.S.C. § 7221i(2)(B), this requirement directly concerns how public moneys are used. It is something else entirely to forbid a religious institution from

setting up or operating a charter school that otherwise meets federal requirements, or to prohibit the developer or operator of such a charter school from having an affiliation with a religious institution, which places a burden on those of faith based on religious identity outside the charter-school program itself. "[T]he Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Trinity Lutheran*, 137 S. Ct. at 2022 (internal quotation marks and citation omitted).

Government-funding "[r]estrictions based on religious status are presumptively unconstitutional." *Religious Restrictions*, 43 Op. O.L.C. __, at *6; *see Trinity Lutheran*, 137 S. Ct. at 2024 (applying the "'most rigorous'" scrutiny to a funding restriction based on religious status (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)). It is true that "the need to comply with the Establishment Clause may justify restrictions that would otherwise amount to impermissible religious discrimination." *Religious Restrictions*, 43 Op. O.L.C. __, at *7. But the "Establishment Clause permits the government to include religious institutions, along with secular ones, in a generally available aid program that is secular in content," *id*. at *9, as the charter-school program is here, *see* 20 U.S.C. § 7221i(2)(E) (requiring charter school to be "nonsectarian in its programs, admissions policies, employment practices, and all other operations"). As we recognized in *Religious Restrictions*, the Supreme Court has sometimes suggested that even a religiously neutral government-aid program involving direct government subsidies must have protections that "ensure that funds are not diverted to a religious use," *id.* at *11, in order to comply with the Establishment Clause. But even if that principle retains vitality today—and we have our doubts, *see id.* at *9–11—the statute here has such a safeguard, because it mandates that a charter school's programs and practices be non-sectarian and be under public supervision.

The status-based religious discrimination here cannot be justified by the Establishment Clause concerns that sometimes arise when a government singles out a religious entity to carry out a governmental function—here, the operation of what the statute defines as a "public school." *See Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687 (1994); *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982). In *Kiryas Joel*, the Supreme Court invalidated a state statute that had drawn a school

district around a village occupied almost exclusively by practitioners of Satmar Hasidism, a strict form of Judaism, based on the Court's perception that the statute in question was a "special and unusual" legislative act intended to confer particular benefits on the Satmar community. 512 U.S. at 702; *see also id.* at 716 (O'Connor, J., concurring in part and concurring in the judgment) (viewing the law as "singl[ing] out a particular religious group for favorable treatment"); *Grendel's Den*, 459 U.S. at 117, 127 (invalidating a state statute that allowed a church to veto the zoning license of a liquor store within 500 feet of the church). The program here, if it did not exclude religiously affiliated charter schools, would raise no such concerns because it is otherwise neutral toward religion. Religiously affiliated charter schools would receive no special benefit or authority and would have to meet the same standards as other charter schools to participate in the program. *See, e.g.*, 20 U.S.C. § 7221b(f)(1)(A)(vi), (x), (2)(F), (G).

ESEA's charter-school program is not unusual in that regard. Many federal statutes, including ones administered by the Department of Education, allow a religious organization to partner with the federal government on the same basis as a secular organization in carrying out a particular social service program. *See, e.g.*, Exec. Order No. 13,279, § 2(g) (Dec. 12, 2002), 67 Fed. Reg. 77,141 (Dec. 16, 2002), *as amended by* Exec. Order No. 13,559, § 1(b) (Nov. 17, 2010), 75 Fed. Reg. 71,319, 71,320 (Nov. 22, 2010) ("Faith-based organizations should be eligible to compete for Federal financial assistance used to support social service programs and to participate fully in the social service programs supported with Federal financial assistance without impairing their independence, autonomy, expression outside the programs in question, or religious character."); 2 C.F.R. § 3474.15(b)(1) ("A faith-based organization is eligible to contract with grantees and subgrantees, including States, on the same basis as any other private organization, with respect to contracts for which such other organizations are eligible."). These kinds of arrangements do not violate the Establishment Clause. *See generally, e.g.*, *Direct Aid to Faith-Based Organizations Under the Charitable Choice Provisions of the Community Solutions Act of 2001*, 25 Op. O.L.C. 129 (2001).

Forbidding charter schools under the program from affiliating with religious organizations discriminates on the basis of religious status.

The mere "interest in 'skating as far as possible from religious establishment concerns,'" *Religious Restrictions*, 43 Op. O.L.C. __, at *17 (quoting *Trinity Lutheran*, 137 S. Ct. at 2024), cannot suffice to support such discrimination. Accordingly, the religious non-affiliation requirement in 20 U.S.C. § 7221i(2)(E) violates the Free Exercise Clause of the First Amendment. Should the Department of Education establish a policy not to enforce this provision, it should report that decision to Congress within thirty days of establishing the policy. *See* 28 U.S.C. § 530D(a)(1)(A)(i), (b)(1), (e).

HENRY C. WHITAKER
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
