# United States Court of Appeals

## For the First Circuit

<hr>

No. 04-1496

JOHN EULITT AND BELINDA EULITT, AS PARENTS AND
NEXT FRIENDS OF CATHLEEN N. EULITT, ET AL.,

Plaintiffs, Appellants,

v.

STATE OF MAINE, DEPARTMENT OF EDUCATION, ET AL.,

Defendants, Appellees.

<hr>

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

<hr>

Before

Boudin, Chief Judge,

Selya, Circuit Judge,

and Schwarzer,* Senior District Judge.

<hr>

Stephen C. Whiting, with whom The Whiting Law Firm, P.A. was
on brief, for appellants.
Paul Stern, Deputy Attorney General, with whom G. Steven Rowe,
Attorney General, William H. Laubenstein, III, and Sarah A.
Forster, Assistant Attorneys General, were on brief, for appellees.

<hr>

*Of the Northern District of California, sitting by designation.

Robert H. Chanin, Andrew D. Roth, Laurence Gold, Bredhoff & Kaiser, P.L.L.C., Elliott M. Mincberg, Judith E. Schaeffer, Ayesha N. Khan, Zachary L. Heiden, Jeffrey A. Thaler, and Bernstein, Shur, Sawyer & Nelson, P.A. on consolidated brief for Maine Education Association, National Education Association, Americans United for Separation of Church and State, People for the American Way Foundation, and Maine Civil Liberties Union, amici curiae.

October 22, 2004

**SELYA**, **Circuit Judge**.  This case calls upon us to decide whether the Equal Protection Clause requires Maine to extend tuition payments to private sectarian secondary schools on behalf of students who reside in a school district that makes such payments available on a limited basis to private nonsectarian secondary schools.  We hold that the Equal Protection Clause does not impose any such obligation.  Accordingly, although our reasoning differs from that of the district court, we affirm the entry of summary judgment in the defendants' favor.

## I.  BACKGROUND

By statute, Maine commits to providing all school-aged persons with "an opportunity to receive the benefits of a free public education," Me. Rev. Stat. Ann. tit. 20-A, § 2(1) (West 2004), and vests authority in local school districts to fulfill that undertaking by maintaining and supporting elementary and secondary education, id. §§ 2(2), 4501.  School districts, known in Maine's bureaucratic argot as school administrative units, enjoy some flexibility in administering this guarantee.  They may satisfy the state mandate in any of three ways:  by operating their own public schools, see id. § 1258(1), by contracting with outside public schools to accept their students, see id. §§ 1258(2), 2701; or by paying private schools to provide such an education, see id. §§ 2951, 5204(4).  State law bars a school district that exercises

-3-

the third option from paying tuition to any private sectarian school.  Id. § 2951(2).

The town of Minot comprises a school administrative unit. It has decided to operate its own grade school (kindergarten through eighth grade), but has chosen to outsource secondary education.  To this end, Minot has contracted with a neighboring school district — the town of Poland — to educate at least 90% of its eligible students at Poland Regional High School (PRHS).  The contract gives Minot the right to send up to 10% of its high schoolers to other approved nonsectarian secondary schools (private or public) so long as those students can demonstrate that they have educational needs that PRHS cannot satisfy.  The superintendent of School Union #29, which consists of the school administrative units of Poland, Mechanic Falls, and Minot, reviews applications for such alternative placements on a case-by-case basis.  By operation of section 2951(2), however, sectarian schools cannot win approval for publicly funded tuition payments (and, thus, Minot cannot underwrite tuition for youths seeking to attend such schools).

John and Belinda Eulitt and Kelly J. MacKinnon are parents residing in Minot who, on their own dime, send their daughters to St. Dominic's Regional High School, a Catholic secondary school that is indisputably sectarian.  They believe that, under Minot's education plan, the state and the town should pay tuition directly to St. Dominic's on behalf of their daughters

-4-

because PRHS does not offer classes in Catholic doctrine or teach from a Catholic viewpoint (and, therefore, does not meet the full range of their daughters' educational needs). The parents have not submitted formal applications for such funding because section 2951(2), which forbids the payment of public dollars to sectarian schools, would prevent the superintendent from approving any such applications. Instead, as parents and next friends of their daughters, they brought suit in Maine's federal district court against various state educational authorities. Pertinently, their complaint alleged that section 2951(2)'s restriction on the approval of sectarian schools for placements funded by public tuition payments violates the Equal Protection Clause of the Fourteenth Amendment because that restriction discriminates on the bases of religion, religious speech, and viewpoint. Additionally, the complaint asserted a separate equal protection claim on behalf of St. Dominic's, in which the parents argued that section 2951(2) strips the school of equal protection of the laws because it denies the school the ability to receive public funds for providing secondary education services even though it allows private nonsectarian schools to receive such stipends.

In due course, the parties cross-moved for summary judgment. The district court referred the motions to a magistrate judge who recommended, inter alia, that summary judgment be granted in favor of the defendants on the equal protection claims. Eulitt

v. Me. Dep't of Educ., No. 02-162, 2003 WL 21909790, at *4 (D. Me. Aug. 8, 2003). The magistrate judge ruled that the Equal Protection Clause does not compel the provision of public funds to private sectarian schools, even when a school district has chosen to subsidize the payment of tuition to private nonsectarian schools on a limited basis. Id. at *3-4. On objection, see 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), the district court concurred with the magistrate judge's recommended decision, but it did so solely on the ground that this court's decision in Strout v. Albanese, 178 F.3d 57 (1st Cir. 1999), had "authoritatively answered exactly the same questions Plaintiffs now urge this Court to decide," and, therefore, pretermitted further inquiry under the doctrine of stare decisis. Eulitt v. Me. Dep't of Educ., 307 F. Supp. 2d 158, 161 (D. Me. 2004). This appeal ensued.

## II. ANALYSIS

The appellants hawk three propositions on appeal. First, they urge that the doctrine of stare decisis does not foreclose consideration of their substantive claims. Second, they contend that the Establishment Clause does not compel Maine to eschew public funding of sectarian education (and, hence, does not prevent the state from providing the redress that they seek). Third, they asseverate that section 2951(2) violates the Equal Protection Clause because it discriminates on the bases of religion, religious

-6-

speech, and viewpoint. We consider these propositions sequentially.

## A. **Stare Decisis**.

As a general matter, the doctrine of stare decisis precludes the relitigation of legal issues that have previously been heard and authoritatively determined. Stewart v. Dutra Constr. Co., 230 F.3d 461, 467 (1st Cir. 2000). In other words, stare decisis "renders the ruling of law in a case binding in future cases before the same court or other courts owing obedience to the decision." Gately v. Massachusetts, 2 F.3d 1221, 1226 (1st Cir. 1993) (emphasis in original). For present purposes, the question reduces to whether our earlier decision in Strout constitutes such a bar.

Strout arose in a very similar posture. There, we upheld the constitutionality of section 2951(2) against equal protection, establishment, and free exercise challenges brought by parents (not the present plaintiffs) who sought public funding for their children's matriculation at St. Dominic's. Strout, 178 F.3d at 64-65. The Strout panel rejected the equal protection challenge because Maine had shown a compelling interest in avoiding an Establishment Clause violation through the exclusion of sectarian schools from its secondary education tuition program. Id. at 64. Two members of the panel further speculated, in dictum, that if Maine's proffered interest had been found to depend upon an

erroneous understanding of the Establishment Clause (that is, if it had been determined that payments to sectarian schools were permissible under that clause), then the state's exclusion of sectarian schools from the tuition program would not withstand scrutiny. Id. at 64 n.12.

Three years later, the Supreme Court decided Zelman v. Simmons-Harris, 536 U.S. 639 (2002). That opinion altered the landscape of Establishment Clause jurisprudence in the school finance context by upholding a program that allowed income-qualified parents in Cleveland to elect to apply state-funded school vouchers toward their children's tuition at private sectarian schools. Id. at 644-46, 663. The Zelman Court announced that indirect public aid to sectarian education is constitutionally permissible when the financial assistance program has a valid secular purpose, provides benefits to a broad spectrum of individuals who can exercise genuine private choice among religious and secular options, and is neutral toward religion. Id. at 662-63.

Last term, the Supreme Court again addressed the application of the First Amendment to educational funding issues. The Court upheld a Washington state college scholarship program that prohibited the application of scholarship funds toward the pursuit of a devotional theology degree. Locke v. Davey, 124 S. Ct. 1307, 1309 (2004). In so doing, the Court reaffirmed that

"'there is room for play in the joints'" between the Religion Clauses.  Id. at 1311 (quoting Walz v. Tax Comm'n, 397 U.S. 664, 669 (1970)).  By this, the Davey Court meant that "there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause."  Id.

The Zelman opinion raises the distinct possibility that Strout's view of Maine's asserted interest depended upon an incorrect interpretation of the Establishment Clause's strictures. Davey also casts doubt on the reasoning of Strout because it clarifies, and subtly alters, the decisional framework to be applied to equal protection claims that are rooted in allegations of religious discrimination.  The district court nevertheless declined to consider the effects of Zelman and Davey on the continuing vitality of Strout.  We do not find fault with that cautious approach.  See Crowe v. Bolduc, 365 F.3d 86, 94 (1st Cir. 2004) (noting that district court correctly regarded circuit precedent as "good law" even though a subsequent Supreme Court dictum had "presaged the demise" of the rule stated therein). Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority.  See Sarzen v. Gaughan, 489 F.2d 1076, 1082 (1st Cir. 1973) (explaining that stare decisis requires lower courts to take binding pronouncements "at face value until formally altered"); cf.

-9-

<u>Agostini</u> v. <u>Felton</u>, 521 U.S. 203, 237-38 (1997) (reaffirming that the Court has the prerogative to overrule its own decisions).

We are, of course, in a somewhat different position. Even though "our precedent-based system of justice places a premium on finality, stability, and certainty in the law," <u>Stewart</u>, 230 F.3d at 467, "<u>stare</u> <u>decisis</u> is neither a straightjacket nor an immutable rule," <u>Carpenters Local Union No. 26</u> v. <u>U.S. Fid. & Guar. Co.</u>, 215 F.3d 136, 142 (1st Cir. 2000). Thus, a panel of the court of appeals has some flexibility, modest though it may be, with respect to its own precedents.

Ordinarily, newly constituted panels in a multi-panel circuit should consider themselves bound by prior panel decisions. <u>See</u> <u>United States</u> v. <u>Rodriguez</u>, 311 F.3d 435, 438-39 (1st Cir. 2002); <u>United States</u> v. <u>Wogan</u>, 938 F.2d 1446, 1449 (1st Cir. 1991). This rule is a specialized application of the stare decisis principle. It is, however, subject to at least two exceptions, either of which may warrant a departure from a prior holding.

The first exception comes into play when a preexisting panel opinion is undermined by subsequently announced controlling authority, such as a decision of the Supreme Court, a decision of the en banc court, or a statutory overruling. <u>Williams</u> v. <u>Ashland Eng'g Co.</u>, 45 F.3d 588, 592 (1st Cir. 1995). That exception does not apply here. Although <u>Zelman</u> did confirm that the state may provide funding for sectarian education in certain instances, <u>see</u>

Zelman, 536 U.S. at 662-63, the decision depended upon the Court's careful consideration of the facts underlying the Cleveland voucher program, see id. at 653-57. Even after Zelman and Davey, it is fairly debatable whether or not the Maine tuition program could survive an Establishment Clause challenge if the state eliminated section 2951(2) and allowed sectarian schools to receive tuition funds.[1] Thus, the newly emergent Supreme Court case law does not necessarily undercut the Strout panel's premise, 178 F.3d at 64 & n.12, that Maine could not extend funding to sectarian schools under its program without violating the Establishment Clause.

A second exception exists when recent Supreme Court precedent calls into legitimate question a prior opinion of an inferior court. Carpenters Local Union No. 26, 215 F.3d at 141; see also Crowe, 365 F.3d at 89, 92. In that context, a reviewing court must pause to consider the likely significance of the neoteric Supreme Court case law before automatically ceding the field to an earlier decision. See Williams, 45 F.3d at 592 (explaining that stare decisis may yield in "those relatively rare instances in which authority that postdates the original decision,

---

[1]Without belaboring the point, we note that the Maine program is substantially narrower than the "broad[] undertaking by the State to enhance educational options" that was under scrutiny in Zelman, 536 U.S. at 647. Moreover, Maine's scheme provides for the approval of applications based on an individualized assessment of educational benefit, whereas the Cleveland program employed only objective criteria of financial need and residency. See id. at 662.

although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind").

We think that this exception applies here. In _Strout_, the panel explicitly relied on "the present state of jurisprudence" in determining that Maine's interest in excluding sectarian schools from its tuition program would survive any level of scrutiny because the Establishment Clause likely required the state to maintain such an exclusion. _Strout_, 178 F.3d at 64. In reaching this conclusion, the panel candidly observed that "the guidance provided by the Supreme Court has been less than crystalline." _Id._ _Zelman_ and _Davey_ obviously constitute significant developments in the pertinent jurisprudence and shed new light on the case law upon which the _Strout_ decision hinged. If these decisions, collectively, do not make the law crystalline, they at least provide more focused direction than was available to the _Strout_ panel. Consequently, we find it incumbent upon us to reject a rote application of stare decisis here and to undertake a fresh analysis. _See_ _Arecibo Cmty. Health Care, Inc._ v. _Puerto Rico_, 270 F.3d 17, 24 (1st Cir. 2001).

### B. **The Establishment Clause**.

The appellants' second proposition invites us to determine whether the state's asserted interest in maintaining section 2951(2)'s parochial school exclusion in order to avoid an

-12-

Establishment Clause violation is a valid one. This proposition is asserted out of order: because the response to it depends upon what level of scrutiny we should apply in this case, the proposition itself is not susceptible to consideration at a preliminary point in our analysis. We explain briefly.

It cannot be gainsaid that Establishment Clause defenses sometimes trigger consideration of hypothetical statutory schemes to determine whether entanglement concerns actually justify a particular feature of a challenged law. However, such defenses should not be addressed until a court has identified the right at issue and ascertained the level of scrutiny that attaches to it. See, e.g., Good News Club v. Milford Cent. Sch., 533 U.S. 98, 112-13 (2001) (weighing the validity of a school's Establishment Clause defense after finding that the challenged restriction constituted viewpoint discrimination and that strict scrutiny therefore applied); Widmar v. Vincent, 454 U.S. 263, 270-71 (1981) (determining first that religious group's exclusion from open forum was discriminatory, and then reviewing school's Establishment Clause defense for retaining its existing forum access policy instead of adopting a hypothetical policy that would be more inclusive). That sequence is particularly significant in view of the time-honored axiom that federal courts should withhold decision on vexing constitutional questions until consideration of those questions becomes necessary. See Ala. State Fed'n of Labor v.

McAdory, 325 U.S. 450, 461 (1945) (noting that "[i]t has long been [the Court's] considered practice not to decide abstract, hypothetical or contingent questions, or to decide any constitutional question in advance of the necessity for its decision") (citations omitted); El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir. 1992) (similar).

That ends this aspect of the matter. Consideration of the question that the appellants seek to pose — whether section 2951(2) or some similar restriction is indispensable to Maine's obligation to keep its tuition program in compliance with the Establishment Clause — is premature at this juncture. Instead, we explore the contours of the right at issue and ascertain what level of scrutiny an Establishment Clause defense would have to survive.

### C. **Equal Protection**.

The heart of the appellants' claim is the proposition that section 2951(2) violates both the equal protection rights of St. Dominic's and the appellants' own equal protection rights (as parents and next friends of their children) because the statute discriminates on the bases of religion and religious speech. Before untangling this argument, we first address the threshold question of standing.

1. **Standing**. We start with the question whether the appellants have standing to raise a constitutional claim on behalf of St. Dominic's. An individual who asserts the constitutional

-14-

rights of a third party must, of course, satisfy the Article III requirements of injury in fact, causation, and redressability with respect to the third-party claim. See Valley Forge Christian Coll. v. Americans United for Sep. of Church & State, Inc., 454 U.S. 464, 472 (1982). In addition, that party must satisfy the prerequisites that arise from prudential limitations on the jurisdiction of the federal courts, namely, that the litigant personally has suffered an injury in fact that gives rise to a sufficiently concrete interest in the adjudication of the third party's rights; that the litigant has a close relationship to the third party; and that some hindrance exists that prevents the third party from protecting its own interests. Powers v. Ohio, 499 U.S. 400, 411 (1991); Playboy Enters. v. Pub. Serv. Comm'n, 906 F.2d 25, 37 (1st Cir. 1990).

In the case at hand, the appellants contend that section 2951(2) causes them injury in fact because it compels the superintendent to reject all applications for the funding of a high school education at St. Dominic's on the ground that the school is religiously oriented (and, thus, ineligible to receive tuition payments). Therefore, the statute's restriction on the school translates into the parents' inability to gain approval for the public funding of their children's sectarian education. This link between the appellants' interests and those of St. Dominic's may suggest the type of special relationship that would support a departure from the general proscription on jus tertii claims. See,

-15-

e.g., Craig v. Boren, 429 U.S. 190, 195 (1976) (finding vendor satisfied jus tertii requirement to advocate for rights of third-party consumers who may wish to purchase its wares); Pierce v. Soc'y of Sisters, 268 U.S. 510, 535 (1925) (recognizing standing of religious schools to assert the rights of potential pupils who might seek access to their education services).

Assuming for argument's sake, but without deciding, that both an injury and a sufficient relationship exist, the appellants nonetheless stumble on the third step of the jus tertii standing framework: they have wholly failed to show any obstacle preventing St. Dominic's from bringing suit to protect itself against the imagined infringements. The appellants have advanced no credible suggestion either that St. Dominic's is generically unable to assert its rights or that the circumstances of this case create some idiosyncratic barrier to such a suit. Then, too, all of the environmental factors point the other way. For one thing, section 2951(2) does not impose or threaten to impose any criminal or civil penalty for any action that might be taken by sectarian schools. Thus, this case does not fall into the isthmian category of cases in which courts have recognized jus tertii standing because a third party is understandably reluctant to engage in the allegedly protected activity for fear of prosecution or other penalty.[2] See,

_____

[2]The appellants alleged for the first time in their appellate briefs that St. Dominic's faced an obstacle to suit arising out of the risk of "reprisals" by the appellees (e.g., the loss of

e.g., Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973) (recognizing third-party standing to bring First Amendment overbreadth claims). For another thing, the appellants are not exposed to any criminal or civil penalty because of their interaction with the school; accordingly, cases in which the putative litigant faced such penalties by providing assistance or service to the holder of the third-party right are inapposite. See, e.g., Craig, 429 U.S. at 193-94 (finding third-party standing where litigant, a beer vendor, faced sanctions and loss of license for sales to men between eighteen and twenty years of age). And, finally, this case is not one in which the right-holder has little or no financial incentive to pursue suit or, alternatively, would face great difficulty in demonstrating that the alleged injury was likely to reoccur. See, e.g., Powers, 499 U.S. at 414-15 (noting that the barriers to suit by a potential juror who believes he has been excluded because of race are "daunting" because of the small financial stake involved as well as the difficulty of proving that such discrimination would recur).

At the expense of carting coal to Newcastle, we add that the underlying justifications for the prudential limitation on third-party standing could be thwarted were the appellants allowed

approved status for purposes of Maine's compulsory school laws). This charge, in addition to being belated, is entirely without foundation in the summary judgment record. We therefore reject it out of hand.

-17-

to serve as proxy-holders for St. Dominic's. Those justifications include the venerable tenet that "third parties themselves usually will be the best proponents of their own rights." Singleton v. Wulff, 428 U.S. 106, 114 (1976). They also include the wise counsel that, sometimes, the holder of a right has reasons of its own for not pursuing potential claims. See, e.g., Friedman v. Harold, 638 F.2d 262, 265-66 (1st Cir. 1981). An exception to these basic maxims sometimes is warranted because a congruence of interests exists between a litigant and a third party. See Playboy Enters., 906 F.2d at 38. Here, however, it is by no means apparent that the appellants and St. Dominic's share a common interest; it is entirely possible that the school has refrained from litigation precisely because it is not interested in participating in Maine's tuition program and thereby subjecting itself to any number of concomitant state regulations. Cf., e.g., Am. Library Ass'n v. Odom, 818 F.2d 81, 82 (D.C. Cir. 1987) (finding that researchers seeking access to certain library materials could not assert library's property rights); Friedman, 638 F.2d at 266 (finding that bankruptcy trustee was an inappropriate party to assert certain rights of debtor).

For these reasons, we hold that the appellants lack third-party standing to advance St. Dominic's equal protection claim.

This holding does not end our odyssey. Although the appellants lack standing to pursue their jus tertii claim, they do have standing in their own right to seek global relief in the form of an injunction against the enforcement of section 2951(2) and a declaration of the statute's unconstitutionality. The appellants have established standing directly based on their allegation that section 2951(2) effectively deprives them of the opportunity to have their children's tuition at St. Dominic's paid by public funding. Even though it is the educational institution, not the parent, that would receive the tuition payments for a student whose "educational requirements" application was approved, it is the parent who must submit such an application and who ultimately will benefit from the approval. Because section 2951(2) imposes restrictions on that approval, the parents' allegation of injury in fact to their interest in securing tuition funding provides a satisfactory predicate for standing. See Bennett v. Spear, 520 U.S. 154, 168-69 (1997) (explaining that harm "produced by determinative or coercive effect" upon a third party satisfies the injury in fact requirement when the harm is "fairly traceable" to that effect).

**2. The Merits**. We thus proceed to the merits of the appellants' equal protection claim and consider whether recent Supreme Court precedents, especially the Court's opinions in Zelman and Davey, provide a sound basis for overturning Strout.

In undertaking this examination, we review the district court's entry of summary judgment de novo, considering the record and all reasonable inferences therefrom in the light most favorable to the summary judgment losers (here, the appellants). Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). Our consideration is not inextricably linked to the district court's stare decisis theory; rather, we may affirm the entry of summary judgment on any independent ground fairly presented in the record. Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

The appellants first contend that section 2951(2) discriminates against them on the basis of religion by forcing them to choose between a publicly funded education and what they describe as "their fundamental right[] of religion." Appellants' Br. at 22. They attempt to position this harm under the rubric of equal protection,[3] avoiding any detailed reference to the Free

_____

[3]In their briefs, the appellants alternately invoke the language of fundamental rights and suspect classifications. We focus here on their claim of religion as a fundamental right. We note, however, the hopelessness of any effort to suggest that those who choose to send their children to religious schools comprise a suspect class. The Supreme Court has taken a very limited approach in recognizing suspect classifications. See, e.g., Johnson v. Robison, 415 U.S. 361, 375 n.14 (1974) (describing criteria for establishing a suspect classification). The traditional indicia of suspect classification, such as immutable characteristics determined by birth or membership in a group that is politically powerless, are not present in this case. See id. (declining to categorize group of religious conscientious objectors as a suspect class); see also Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, 483 U.S. 325, 338-39

-20-

Exercise Clause even though that clause defines the scope of the fundamental right to religion incorporated by the Fourteenth Amendment's equal protection guarantee. See Johnson v. Robison, 415 U.S. 361, 375 n.14 (1974).

This crabbed approach will not wash. In Davey, the Supreme Court clearly rejected this type of effort to erect a separate and distinct framework for analyzing claims of religious discrimination under the Equal Protection Clause. See Davey, 124 S. Ct. at 1312 n.3 (confirming that the Free Exercise Clause provides the primary framework for assessing religious discrimination claims). Along these lines, the Court held that if a challenged program comports with the Free Exercise Clause, that conclusion wraps up the religious discrimination analysis. See id. Thus, rational basis scrutiny applies to any further equal protection inquiry.[4] See id.; see also Johnson, 415 U.S. at 375

_____

(1987) (explaining that although laws that draw distinctions among religions can give rise to a suspect classification triggering strict scrutiny, provisions that distinguish generally between secular and religious entities engender rational basis scrutiny).

[4]The majority in Strout found it unnecessary to articulate the particular level of scrutiny it employed in rejecting the equal protection challenge. Strout, 178 F.3d at 64. To the extent the panel may have suggested that a religious discrimination claim might be twice subjected to an analysis aimed at determining the level of scrutiny to be applied — once under the Free Exercise Clause and again as a freestanding claim under the Equal Protection Clause — that implication must be abandoned. Davey unequivocally rejected such an approach on the ground that the free exercise analysis definitively answers the question whether the challenged state action impermissibly infringes upon the fundamental right to religion. See Davey, 124 S. Ct. at 1312 n.3. Thus, an equal

-21-

n.14 (explaining that once a law is found to be valid with respect to the free exercise right, there is "no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test" in addressing an equal protection claim).  Accordingly, we inquire whether intervening Supreme Court precedent alters the panel's conclusion in <u>Strout</u> that section 2951(2) marks no free exercise violation.

In <u>Strout</u>, the panel held that section 2951(2) imposes no substantial burden on religious beliefs or practices — and therefore does not implicate the Free Exercise Clause — because it does not prohibit attendance at a religious school or otherwise prevent parents from choosing religious education for their children.[5]  <u>Strout</u>, 178 F.3d at 65.  Far from undermining that analysis, <u>Davey</u> reinforces it.  Indeed, <u>Davey</u> confirms that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious

_____

protection claim that challenges a law found not to violate the Free Exercise Clause gives rise only to rational basis review.  <u>See id.</u>

[5]We add that the statute does not exclude residents of Minot from participation in the tuition program on the basis of religion; all school-aged residents are equally eligible to apply for the benefit that the program extends — a free secular education.  Any shift in the decisional calculus for parents who must decide whether to take advantage of that benefit or pay to send their children to a school that provides a religious education is a burden of the sort permitted in <u>Davey</u>, 124 S. Ct. at 1315.

-22-

activity simply because they choose to fund the secular equivalents of such activity. See Davey, 124 S. Ct. at 1313. Consequently, the appellants' effort to characterize Maine's decision not to deploy limited tuition dollars toward the funding of religious education as an impermissible burden on their prerogative to send their children to Catholic school is futile. The fact that the state cannot interfere with a parent's fundamental right to choose religious education for his or her child does not mean that the state must fund that choice. Cf. Maher v. Roe, 432 U.S. 464, 475-77 (1977) (explaining that the fundamental right to abortion does not entail a companion right to a state-financed abortion).

The appellants endeavor to cabin Davey and restrict its teachings to the context of funding instruction for those training to enter religious ministries. Their attempt is unpersuasive. We find no authority that suggests that the "room for play in the joints" identified by the Davey Court, 124 S. Ct. at 1311, is applicable to certain education funding decisions but not others. We read Davey more broadly: the decision there recognized that state entities, in choosing how to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so.

In addition to holding that section 2951(2) imposes no constitutionally impermissible burden on religion, the Strout panel

found no indication that substantial animus against religion had motivated the passage of that law.  See Strout, 178 F.3d at 65. Despite this finding, the appellants, relying on Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993), resurrect the claim that section 2951(2) is presumptively unconstitutional because it lacks religious neutrality on its face. According to this thesis, the fact that the statute expressly excludes sectarian institutions as potential recipients of education funds necessarily indicates an animus against religion.

The decision in Lukumi cannot bear the weight that the appellants pile upon it.  There, the Court invalidated a local ordinance that made it a crime to engage in certain kinds of animal slaughter because it found overwhelming evidence that animus against the Santeria religion had motivated the ordinance's passage.  See id. at 535, 546.  There is not a shred of evidence that any comparable animus fueled the enactment of the challenged Maine statute.

The Davey Court catalogued the principal factors to be considered in determining whether a particular law is motivated by religious animus.  To determine whether any implication that might be drawn from a state's decision not to fund a particular activity constitutes impermissible animus, an inquiring court must examine whether the state action in question imposes any civil or criminal sanction on religious practice, denies participation in the

-24-

political affairs of the community, or requires individuals to choose between religious beliefs and government benefits. See Davey, 124 S. Ct. at 1312-13. To the extent that these factors articulate a test for smoking out an anti-religious animus, the statute here passes that test with flying colors. Maine's decision not to extend tuition funding to religious schools does not threaten any civil or criminal penalty. By the same token, it does not in any way inhibit political participation. Finally, it does not require residents to forgo religious convictions in order to receive the benefit offered by the state — a secular education.

If more were needed — and we doubt that it is — Davey recognized that states are not required to go to the brink of what the Establishment Clause permits. Id. at 1311-12. As part of its formulation of this doctrine, the Davey Court confirmed the legitimacy of extra-constitutional Establishment Clause concerns. See id. Given these acknowledgments, it would be illogical to impose upon government entities a presumption of hostility whenever they take into account plausible entanglement concerns in making decisions in areas that fall within the figurative space between the Religion Clauses. Just as the Davey Court found that the scholarship program at issue there was not inherently suspect simply because "there [was] no doubt that the State could, consistent with the Federal Constitution, permit [scholarship recipients] to pursue a degree in devotional theology," id., the

-25-

mere fact that a hypothetical program in which Maine extended tuition funding to parochial schools might comport with the Establishment Clause would not support a presumption that religious hostility motivated its decision not to adopt such a scheme.

In sum, recent Supreme Court jurisprudence reinforces rather than undermines Strout's conclusion that section 2951(2) perpetrates no free exercise violation. That reinforced conclusion shortens the road that we must travel. Having determined that the appellants' free exercise rights are not implicated by section 2951(2), we have no occasion to ponder whether Maine's Establishment Clause defense constitutes a compelling interest that justifies the challenged restriction. This, in turn, renders it unnecessary to construct and construe a hypothetical tuition plan based on the premise that Maine would repeal section 2951(2) but leave intact all other relevant provisions of the statutory scheme.

It follows inexorably that we must apply rational basis scrutiny to the lines that the Maine statute actually draws. See Davey, 124 S. Ct. at 1312 n.3. That means that the appellants bear the burden of demonstrating that there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals. Kittery Motorcycle, Inc. v. Rowe, 320 F.3d 42, 47 (1st Cir. 2003); Montalvo-Huertas, v. Rivera-Cruz, 885 F.2d 971, 978-79 (1st Cir. 1989). Like any other challenger confronting rational basis

-26-

review, they must rule out every plausible rationale that might support the law at issue. <u>Heller</u> v. <u>Doe</u>, 509 U.S. 312, 320 (1993); <u>Boivin</u> v. <u>Black</u>, 225 F.3d 36, 44 (1st Cir. 2000).

Under the best of circumstances, this is a steep uphill climb for a plaintiff. The appellants have declined to engage in it. At oral argument in this court, they conceded that if the rational basis test applies, their equal protection claim fails. This concession is understandable: the legislative history clearly indicates Maine's reasons for excluding religious schools from education plans that extend public funding to private schools for the provision of secular education to Maine students. These reasons include Maine's interests in concentrating limited state funds on its goal of providing secular education, avoiding entanglement, and allaying concerns about accountability that undoubtedly would accompany state oversight of parochial schools' curricula and policies (especially those pertaining to admission, religious tolerance, and participation in religious activities). In all events, we accept the appellants' concession at face value and hold that their equal protection challenge to section 2951(2) fails as a matter of law.

We need not tarry in addressing appellants' additional contention that section 2951(2) violates the fundamental right to speech because it discriminates on the basis of religious viewpoint. The statute at issue here does not implicate the

-27-

appellants' speech rights at all.  As the Supreme Court made clear in <u>Davey</u>, state programs to fund general tuition costs are not fora for speech.  <u>Davey</u>, 124 S. Ct. at 1312 n.3.  The Maine education plan deals with the provision of secular secondary educational instruction to its residents; it does not commit to providing any open forum to encourage diverse views from private speakers.  Consequently, cases dealing with speech fora — such as <u>Rosenberger</u> v. <u>Rector & Visitors of Univ. of Va.</u>, 515 U.S. 819 (1995), relied upon by the appellants — are not relevant.  <u>See</u> <u>Davey</u>, 124 S. Ct. 1312 n.3.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we conclude that the district court did not err in granting the appellees' motion for summary judgment.


**<u>Affirmed</u>**.