# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

AUGUST TERM 2020
No. 21-87

### IN RE A.H.

A.H., BY AND THROUGH HER PARENTS AND NATURAL GUARDIANS, JAMES HESTER AND DARLENE HESTER, JAMES HESTER, INDIVIDUALLY, DARLENE HESTER, INDIVIDUALLY, ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT, C.R., BY AND THROUGH HER PARENTS AND NATURAL GUARDIANS, GILLES RAINVILLE AND ELKE RAINVILLE, GILLES RAINVILLE, INDIVIDUALLY, ELKE RAINVILLE, INDIVIDUALLY, E.R., BY AND THROUGH HER PARENTS AND NATURAL GUARDIANS, CHAD ROSS AND ANGELA ROSS, CHAD ROSS, INDIVIDUALLY, ANGELA ROSS, INDIVIDUALLY, A.F., BY AND THROUGH HER PARENTS AND NATURAL GUARDIANS, DANIEL FOLEY AND JULIANE FOLEY, JULIANE FOLEY, INDIVIDUALLY, DANIEL FOLEY, INDIVIDUALLY,
*Petitioners,*

v.

DANIEL M. FRENCH, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE VERMONT AGENCY OF EDUCATION, MICHAEL CLARK, IN HIS OFFICIAL CAPACITY AS GRAND ISLE SUPERVISORY UNION SUPERINTENDENT, SOUTH HERO BOARD OF SCHOOL DIRECTORS, CHAMPLAIN ISLANDS UNIFIED UNION SCHOOL DISTRICT BOARD OF SCHOOL DIRECTORS, JAMES TAGER, IN HIS OFFICIAL CAPACITY AS FRANKLIN WEST SUPERVISORY UNION SUPERINTENDENT, GEORGIA BOARD OF SCHOOL DIRECTORS,
*Respondents.*[*]

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

SUBMITTED: FEBRUARY 2, 2021
DECIDED: FEBRUARY 3, 2021
OPINION ISSUED: JUNE 2, 2021

Before:      JACOBS, SULLIVAN, AND MENASHI, *Circuit Judges*.

In Vermont, some school districts do not operate public high schools. Pursuant to Vermont's Town Tuition Program ("TTP"), these "sending districts" pay tuition to independent schools on behalf of high-school-aged students residing in the districts. The statutory provisions governing the program provide that each student is entitled to select the independent school of his or her choice. The petitioners in this case applied to their respective sending districts for tuition funding under the TTP, but their requests were denied.

The petitioners brought suit seeking injunctive relief, claiming that the denials violated their rights to the free exercise of religion under the First Amendment. On a motion for a preliminary injunction, the district court found that the school districts—endeavoring to comply with a state constitutional provision—denied the petitioners' funding requests solely because of the religious status of the petitioners' chosen school. Following Supreme Court precedent, the district court ruled that the exclusion of the petitioners from the TTP violated the First Amendment, and the district court granted a preliminary injunction in the petitioners' favor. The scope of that injunction, however, was limited. The district court refused to enjoin the school districts from maintaining the funding denials it had

held unconstitutional. Rather, in light of the respondents' desire to develop new criteria for TTP eligibility that would satisfy the state constitution, the district court merely enjoined the school districts from continuing to exclude the petitioners from the TTP based solely on the religious status of the petitioners' chosen school.

The petitioners appealed that decision and moved for an emergency injunction pending appeal that would grant the relief the district court omitted from its preliminary injunction. We construed this motion as a petition for a writ of mandamus directing the district court to amend its preliminary injunction. Because the petitioners clearly had a right to the relief they requested and mandamus was justified to enable them to obtain that relief, we GRANTED the petition by an order issued on February 3, 2021, which noted that an opinion would be forthcoming. This opinion explains the reasoning for that order.

Judge Menashi also files a concurring opinion.

---

David A. Cortman, Alliance Defending Freedom, Lawrenceville, GA (John J. Bursch and Paul Daniel Schmitt, Alliance Defending Freedom, Washington, DC; Ryan J. Tucker, Alliance Defending Freedom, Scottsdale, AZ; and Thomas E. McCormick, McCormick, Fitzpatrick, Kasper & Burchard, P.C., Burlington, VT, *on the brief*), *for Petitioners*.

Jon T. Alexander, Assistant Attorney General (Benjamin D. Battles, Solicitor General, and Rachel E. Smith, Assistant Attorney General, *on the brief*), Office of the Attorney General, Montpelier, VT, *for Thomas J. Donovan*

3

*Jr., Attorney General of Vermont, for Respondent Daniel M. French.*

William F. Ellis (Kevin J. Coyle, *on the brief*), McNeil, Leddy & Sheahan, P.C., Burlington, VT, *for Respondents Michael Clark, South Hero Board of School Directors, Champlain Islands Unified Union School District Board of School Directors, James Tager, and Georgia Board of School Directors.*

MENASHI, *Circuit Judge*:

Four years ago, the Supreme Court reminded states that it "has repeatedly confirmed that denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest of the highest order." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (internal quotation marks omitted). Last June, the Court clarified that this rule does not allow a state to apply a state constitutional prohibition on aid to religion that would "bar[] religious schools from public benefits solely because of the religious character of the schools." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020). The Court emphasized that "[s]tatus-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses" and that a state cannot justify discrimination against religious schools and students by invoking an "interest in separating church and State more fiercely than the Federal Constitution." *Id.* at 2256, 2260 (internal quotation marks omitted).

The officials who administer Vermont's Town Tuition Program ("TTP")—respondents here—nevertheless continued to discriminate against religious schools and students in violation of the First Amendment. When a student resides in a school district that does not maintain a public high school, the TTP entitles that student to a tuition payment to attend the independent high school of his or her choice. The individual petitioners in this case, who reside in such districts, applied for TTP payments to attend Rice Memorial High School ("Rice"). The school districts denied their requests on the ground that Rice is a religiously affiliated school. According to the school districts, the petitioners could receive tuition payments under the TTP only if they chose to attend a secular school instead.

The petitioners brought suit challenging the discriminatory denials and sought a preliminary injunction that would end their exclusion from the TTP. Unsurprisingly, the district court concluded that the petitioners had satisfied the necessary elements and were entitled to a preliminary injunction—and the district court entered such an injunction. *A.H. ex rel. Hester v. French* (*French I*), No. 2:20-CV-151, 2021 WL 62301, at *8, *10-12 (D. Vt. Jan. 7, 2021). **"The scope of [the] injunctive relief, however,"** was "limited." *Id.* at *12. The district court enjoined the school districts only from excluding the petitioners based on the precise rationale on which the districts had previously relied; the court declined to mandate that the districts allow the petitioners to participate in the TTP until the case was resolved. *Id.* at *13. The district court reasoned that it would be improper to provide the full relief the petitioners sought before the respondents had an opportunity to develop new criteria for TTP eligibility that would satisfy Vermont's constitution, which the Vermont Supreme Court has interpreted as prohibiting public funding for "religious

education." *Id.* at *3, *12-13; *see Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 562 (Vt. 1999). In the meantime, the school districts could, and did, continue to exclude the petitioners from the TTP as long as they sought to attend Rice.

The district court so ruled even though in the two decades since the Vermont Supreme Court's decision, neither the school districts nor Vermont's Agency of Education had ever developed any alternative criteria for TTP eligibility. And Rice therefore never had an opportunity to comply with any such criteria. Given the limited scope of the district court's injunction, the petitioners faced a new and additional obstacle to accessing TTP benefits before the new school semester began—an obstacle that resulted from the school districts' and the state's prior decision to rely on unconstitutional status-based discrimination rather than attempt to develop narrower criteria in the first place.

The petitioners appealed the district court's decision to limit the scope of its injunction and moved for an emergency injunction pending appeal that would prohibit the school districts from continuing to deny their TTP funding requests. We construed this motion as a petition for a writ of mandamus directing the district court to amend its preliminary injunction. On February 3, 2021, we granted the petition, ordering the district court "to amend its preliminary injunction to prohibit the [respondents] from continuing to deny the [petitioners'] requests for tuition reimbursement under the TTP, regardless of [Rice's] religious affiliation or activities." Order Granting Petition for Writ of Mandamus, Feb. 3, 2021 (ECF doc. 59) [hereinafter *Mandamus Order*]. The order noted that an opinion would be forthcoming. *Id.* This opinion explains the reasons for that order.

6

## BACKGROUND

This case involves the intersection of the TTP, Vermont's state constitution as interpreted by its highest court, and the school districts' and the district court's assessment of Rice.

## I

We recently had occasion to describe the TTP in a similar case involving some of the same parties to this litigation:

> [T]he Town Tuition Program is quite simple: If a school district provides elementary education, it is required to provide secondary education. While school districts have a number of options in meeting this obligation, they principally do so in one of two ways: (1) by maintaining a public high school within the district, or (2) by using public funds to pay tuition to an approved public or independent high school within or outside the district, to be selected by the parents or guardians of the student.
>
> Most of Vermont's school districts … meet their obligations under the Town Tuition Program by maintaining public high schools. … Some school districts [commonly described as "Sending Districts"] … however, decline to maintain their own public high schools; they instead use public funds to pay for their students to attend approved independent schools or public schools in other districts.

*A.H. ex rel. Hester v. French* (*French II*), 985 F.3d 165, 171 (2d Cir. 2021) (internal quotation marks omitted) (citing 16 V.S.A. § 822). The TTP is administered by the school boards of the individual school districts, 16 V.S.A. § 822(c)(2), with the ultimate oversight authority in individual cases vested in the State Board of Education, *id.* § 828. Vermont's Agency of Education ("AOE") provides guidance

7

regarding how the school districts should discharge their responsibilities under the TTP. *See French II*, 985 F.3d at 172; *French I*, 2021 WL 62301, at *6 n.6.[1]

Sending Districts pay tuition to an "approved independent high school … to be selected by the parents or guardians of the student." 16 V.S.A. § 822(a)(1). An independent school is "approved" if it meets the state's detailed requirements and educational standards. *Id.* §§ 166(b), 906. A religious as well as a secular school may be "approved," *see id.*, and "[n]othing in the legislation establishing the Town Tuition Program prohibits Sending Districts from paying tuition to religious schools," *French II*, 985 F.3d at 172.

## II

In May 1996, the Chittenden Town School Board approved TTP funding requests for students attending Mount Saint Joseph Academy ("MSJ"), a religious high school. *Chittenden Town*, 738 A.2d at 542-43. In response, the Commissioner of Vermont's Department of Education—the predecessor official to the Secretary of the AOE—cut

---

[1] The State Board of Education and the Agency of Education are distinct bodies with different but overlapping roles. *Compare* 16 V.S.A. § 164 (setting the general powers and duties of the State Board), *with id.* § 212 (delineating the duties of the Secretary of Education), *and id*. § 11(a)(14) ("'Agency of Education' means the Secretary and staff necessary to carry out the functions of the Agency."). Among his other duties, the Secretary of Education must "execute th[e] policies adopted by the State Board," "[s]upervise and direct the execution of the laws relating to the public schools and ensure compliance," and "[s]upervise the expenditure and distribution of all money appropriated by the State … for public schools." *Id.* § 212(5)-(6). The Secretary is also a nonvoting member of the State Board. *Id.* § 161. Before 2013, the Secretary, then designated the "Commissioner," was an employee of the State Board. 16 V.S.A. § 211 (2012) (repealed 2013).

off all funding to the Chittenden Town School District. *Id.* at 543. Parents and the school district sued, and the case made its way to the Vermont Supreme Court. The court ruled that the school district's tuition payments to MSJ violated the "Compelled Support Clause" of Vermont's constitution. *Id.* at 541-42. That clause provides that "no person ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience." Vt. Const. ch. I, art. 3. The court interpreted the language proscribing "compelled … support [of] any place of worship" to prohibit any public funding not only of worship services but also of "religious education." *Id.* at 547, 562. The court concluded that the Chittenden Town School District violated the state constitution by paying tuition to MSJ without "restrictions that [would] prevent the use of [that] public money to fund religious education." *Id.* at 562.

The court noted, however, that the Compelled Support Clause does not necessarily demand that "children who attend religious schools may not receive public educational funding." *Id.* at 563. Rather, the Compelled Support Clause requires only that "public funds may not pay for religious worship," which the court construed to include "religious education." *Id.* at 562-63. Therefore, the court said, Vermont school districts may fund tuition at a religious school if there are "adequate safeguards against the use of [the public] funds for religious [education]." *Id.* at 542. Yet the court "express[ed] no opinion on how the State of Vermont can or should … craft a complying tuition-payment scheme." *Id.* at 563.

"[I]n the more than twenty years since *Chittenden Town* was decided, Vermont has neither amended the Town Tuition Program nor identified adequate safeguards to ensure that Sending Districts

9

do not use public funds to support worship at religious schools." *French II*, 985 F.3d at 172. Rather, the AOE and certain school districts have apparently applied the *Chittenden Town* decision by adopting either a blanket ban on funding tuition at all religious schools, *see id.*; *French I*, 2021 WL 62301, at *6 n.6, or a more limited—but similarly status-based—ban on funding tuition at schools deemed to be "pervasively sectarian" or "pervasively religious," App'x 223-26, 245;[2] *see French II*, 985 F.3d at 185-86 (Menashi, J., concurring).[3]

## III

The Supreme Court has made clear that the prevailing practice in Vermont—maintaining a policy of excluding religious schools from the TTP—is unconstitutional.[4] Even so, the AOE and the respondent school districts did not alter course. When the individual petitioners applied to their local school districts for tuition payments for Rice, an "approved independent school" under Vermont law, they were rejected on the ground that Rice is a "religious" or "parochial" school.

---

[2] Citations to "App'x" refer to the appendix the petitioners submitted with their petition.

[3] While "some Sending Districts have over the past twenty years used public funds to pay tuition for eighty students attending religious schools," the "record does not show … whether these Sending Districts have extended funding in violation of *Chittenden Town* or pursuant to the presence of safeguards." *French II*, 985 F.3d at 172-73.

[4] *See Espinoza*, 140 S. Ct. at 2255-57 (holding that, unless it can satisfy the "strictest scrutiny," a state may not "bar[] religious schools from public benefits solely because of the religious character of the schools" even if the state's "goal" is to "ensur[e] that government aid does not end up being used for 'sectarian education' or 'religious education' … particularly [at] schools that believe faith should permeate everything they do") (alterations, emphasis, and internal quotation marks omitted).

App'x 85-98; *see also French I*, 2021 WL 62301, at *4-5. Furthermore, in response to a funding request from another student, an AOE official told a school district employee that the AOE's "legal team" had determined that "there is no change in a district's ability to pay tuition to a parochial school" after the Supreme Court's decision in *Espinoza*. App'x 119-20.

The petitioners brought suit challenging their TTP funding denials and sought a preliminary injunction ending their exclusion from the TTP during the pendency of the case. The district court ruled on the petitioners' motion for a preliminary injunction on January 7, 2021, and concluded that the petitioners were entitled to a preliminary injunction. The petitioners demonstrated a substantial likelihood of success on the merits of their claim that the school districts violated their rights to the free exercise of religion under the First Amendment. *French I*, 2021 WL 62301, at *10-12. They established that they would suffer irreparable harm in the form of an ongoing "loss of First Amendment freedoms." *Id.* at *8 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). And the balance of the equites and the public interest favored "securing [the petitioners'] First Amendment rights." *Id.* at *12 (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

These conclusions would normally entitle a plaintiff to a preliminary injunction that would "prevent … any further perpetration of injury" pending an adjudication on the merits. *Benson Hotel Corp. v. Woods*, 168 F.2d 694, 696 (8th Cir. 1948); *see Winter v. NRDC*, 555 U.S. 7, 20 (2008). The district court, however, refused to "order the School Defendants to honor Plaintiffs' [Rice] tuition requests." *French I*, 2021 WL 62301, at *12. The district court decided that the school districts should have an opportunity to pursue

compliance with *Chittenden Town* by developing restrictions on religious uses of TTP funding—buttressed by "adequate safeguards"—that might permit the school districts to fund Rice tuition, at least partially, once those safeguards are in place. *Id.* at *11-13.[5] The district court therefore issued a preliminary injunction preventing the school districts "from denying [the petitioners'] applications for Town Tuition Program reimbursement solely on the basis of [Rice's] religious status" but allowed the districts to develop new use-based restrictions on TTP funds. *Id.* at *13. Following the district court's issuance of the preliminary injunction, the school districts could, and did, continue to exclude the petitioners from the TTP.

**IV**

On January 15, 2021, eight days after the district court issued its decision, the petitioners appealed to this court and moved for an emergency injunction pending appeal. The petitioners explained that the upcoming semester at Rice was set to begin on January 25 and the school districts, consistent with the district court's decision, continued to exclude the petitioners from the TTP while working to fashion adequate safeguards. On January 14, for the first time in over

---

[5] In *Espinoza*, the Supreme Court declined to address whether "discrimination against religious *uses* of government aid" would be treated the same as "discriminat[ion] based on religious *status*." 140 S. Ct. at 2257 (emphasis added). At the same time, the Court cautioned that nothing in its opinion was "meant to suggest ... that some lesser degree of scrutiny applies to discrimination against religious uses of government aid," and that "[s]ome Members of the Court, moreover, have questioned whether there is a meaningful distinction between discrimination based on use or conduct and that based on status." *Id.*

12

twenty years, the AOE issued guidance to school districts regarding how to fashion and implement adequate safeguards, and the school districts claimed to need additional time to "digest" that guidance. App'x 378. With the semester starting in a matter of days, the petitioners asked this court to enter an emergency injunction requiring the school districts to end the petitioners' exclusion from the TTP.

On January 22, when the briefing on this motion was complete—and the last business day before the new semester began—an applications judge granted the motion temporarily, pending a decision of the court. *See* Motion Order, Jan. 22, 2021 (ECF doc. 40). On February 3, we construed the motion as a petition for mandamus and ordered the district court "to amend its preliminary injunction to prohibit the [respondents] from continuing to deny the [petitioners'] requests for tuition reimbursement under the TTP, regardless of [Rice's] religious affiliation or activities." *Mandamus Order*.

## DISCUSSION

Though the petitioners sought relief in the form of an emergency injunction pending appeal, their request is better understood as a petition for a writ of mandamus. In this case, the district court decided all the relevant legal questions in the petitioners' favor, holding that they had a substantial likelihood of success on the merits, that they would suffer irreparable harm in the absence of injunctive relief, and that the balance of the equities and the public interest favored securing their First Amendment rights. The objection to the district court's judgment is not that it erred on the merits but that it failed to follow its own conclusions and properly remedy the constitutional injury it identified. Therefore, as we have

done before, we construed the petitioners' motion as a petition for a writ of mandamus ordering the district court to amend its order and to provide the requested relief. *See, e.g.*, *Hong Mai Sa v. Doe*, 406 F.3d 155, 158-59 (2d Cir. 2005); *Stein v. KPMG, LLP*, 486 F.3d 753, 758-59 (2d Cir. 2007).

The remedy of mandamus is "traditionally … used in the federal courts only to 'confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so.'" *Will v. United States*, 389 U.S. 90, 95 (1967) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)).[6] We may issue a writ of mandamus only if: (1) the petitioners have "no other adequate means to attain the relief [they] desire[]," (2) the petitioners' "right to issuance of the writ is clear and indisputable," and (3) we are "satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 380-81 (2004) (internal quotation marks omitted); *see also United States v. Manzano* (*In re United States*), 945 F.3d 616, 623 (2d Cir. 2019). For the reasons described below, these criteria are met in this case.

---

[6] In this traditional formulation, the term "jurisdiction" is not limited to its "modern, technical [meaning], '*i.e.*, the statutory or constitutional power to adjudicate the case.'" Paul R. Gugliuzza, *The New Federal Circuit Mandamus*, 45 Ind. L. Rev. 343, 355 (2012) (alteration omitted) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). "Rather, the [Supreme] Court's rule referred to a 'more flexible notion of "power."'" *Id.* (quoting Note, *Supervisory and Advisory Mandamus Under the All Writs Act*, 86 Harv. L. Rev. 595, 599 (1973)). In the mandamus context, "[i]f a district court 'took some definable action it was not empowered to take or refused to take some definable action that was clearly required,' the error was considered 'jurisdictional,' and mandamus would correct it." *Id.* (alterations omitted) (quoting *Supervisory and Advisory Mandamus*, *supra*).

# I

The petitioners here have "no other adequate means to attain the relief [they] desire[]." *Cheney*, 542 U.S. at 380. For starters, "the district court has … foreclosed the relief" they request. *Manzano*, 945 F.3d at 623 (citing *Kerr v. U.S. Dist. Ct.*, 426 U.S. 394, 404-06 (1976)). The petitioners seek to participate in the TTP during the current school semester. Less than three weeks before the semester started, the district court refused to enjoin the school districts from continuing to exclude the petitioners from the TTP. Instead, it allowed the school districts to maintain the exclusion while the districts took time to craft "adequate safeguards," something no official body in the State of Vermont had ever attempted to do before. The district court thus authorized the school districts to exclude the petitioners from the TTP for an unspecified amount of time—extending into the upcoming semester—and thereby foreclosed the petitioners from obtaining the relief they now seek.

Moreover, the petitioners cannot adequately obtain the relief they seek "through the regular appeals process." *Id.* (citing *Cheney*, 542 U.S. at 380-81). Writs of mandamus generally "cannot be used as substitutes for appeals, even though hardship may result from delay," but "special circumstances" justify the writ here. *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953) (internal citations omitted); *accord Schlagenhauf v. Holder*, 379 U.S. 104, 110-11 (1964). When a petitioner faces significant "irreversible, non-monetary harm" if forced to wait for an appeal to run its course, mandamus may issue to prevent that harm. *In re Depuy Orthopaedics, Inc.*, 870 F.3d 345, 353 (5th Cir. 2017). To determine whether the harm caused by a delay is significant enough to justify mandamus relief, we give consideration "to the severity and extent of this damage, and in

particular to whether a petitioner has lost precious constitutional rights." *In re Halkin*, 598 F.2d 176, 198 (D.C. Cir. 1979) (footnote omitted), *abrogated on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984); *see also Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 511 & n.20 (1959) (approving mandamus to remedy a district court's ruling that "improperly denie[s]" the petitioner's right to a jury trial); *U.S. Alkali Exp. Ass'n v. United States*, 325 U.S. 196, 204 (1945) (issuing an extraordinary writ because of "[t]he hardship imposed on petitioners by a long postponed appellate review, coupled with the attendant infringement of [an] asserted Congressional policy").

In this case, mandamus is the only adequate remedy because the "district court's [order] … has caused and is continuing to cause irreparable harm to [the petitioners'] First Amendment rights." *Pfizer Inc. v. Giles* (*In re Asbestos Sch. Litig.*), 46 F.3d 1284, 1286 (3d Cir. 1994) (Alito, J.); *id.* at 1294-95 (holding that the petitioner lacked any "other adequate means to obtain relief" because "[f]ailure to issue a writ [of mandamus] … would subject [the petitioner] to a continuing impairment of its First Amendment freedoms" as a result of the district court's order); *see also Bridge C.A.T. Scan Assocs. v. Technicare Corp.*, 710 F.2d 940, 944 (2d Cir. 1983) ("Entry of an order that would constitute a prior restraint on speech is an appropriate subject for a mandamus petition."). Without immediate access to the TTP pending the resolution of their case at trial, the petitioners will remain deprived of their constitutional right to the free exercise of religion. The petitioners carried their burden to satisfy every requirement for the issuance of a preliminary injunction providing the relief they requested, and yet the district court failed to "exercise its authority" to remedy the petitioners' injury even though it was the district court's "duty to do so." *Roche*, 319 U.S. at 26.

16

Furthermore, the unjustifiably limited scope of the district court's preliminary injunction effectively ensured that two petitioners would lose the ability to attend Rice this semester. Those petitioners, C.R. and E.R., cannot afford to attend Rice without access to TTP funding. They will therefore suffer an additional irreversible injury if they are forced to wait for the "regular appeals process" to run its course. *Manzano*, 945 F.3d at 623. Under these circumstances, "waiting" for the adjudication of an appeal "can hardly be described as an 'adequate means' of relief eliminating the need for mandamus." *Stein*, 486 F.3d at 762 (quoting *Cheney*, 542 U.S. at 380).

## II

The petitioners' "right to issuance of the writ is clear and indisputable." *Cheney*, 542 U.S. at 381 (internal quotation marks omitted). In circumscribing its preliminary injunction, the district court clearly committed an "abuse of its discretion … [by] render[ing] a decision that cannot be located within the range of permissible decisions." *Manzano*, 945 F.3d at 625 (quoting *Linde v. Arab Bank, PLC*, 706 F.3d 92, 107 (2d Cir. 2013)).

Having concluded that the petitioners suffered status-based discrimination when the school districts denied their TTP funding requests, the district court was required to provide a remedy that would "restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken v. Bradley*, 418 U.S. 717, 746 (1974). The district court's remedy, however, allowed the petitioners' constitutional injury to continue unabated. No party disputes that the school districts would have granted the petitioners' funding requests for the past semester and for the current semester if Rice were not religiously affiliated. Therefore,

17

absent the school districts' status-based discrimination, the petitioners would have had this semester's tuition covered by the TTP. The district court's preliminary injunction should have provided that relief.

Instead, the district court accommodated the school districts' desire to comply with *Chittenden Town*. One might interpret *Chittenden Town* as requiring only a use-based restriction on TTP funds, but the school districts and the AOE have, for decades, applied *Chittenden Town* through status-based exclusion of all religious or pervasively sectarian schools from the TTP. And the school districts maintained this discriminatory practice even after the Supreme Court's ruling in *Espinoza*.[7]

---

[7] In his opposition to this petition, French argues that much of the Supreme Court's opinion in *Espinoza* is not relevant to Vermont's administration of the TTP. French stresses that the Supreme Court "did not undertake to definitively examine or characterize historic school funding practices specific to Vermont" and that Vermont's administration of the TTP is guided by its highest court's interpretation of a state constitutional provision that dates to the Founding Era. Appellee Daniel M. French's Response to Appellants' Emergency Motion for Injunction Pending Appeal Under Fed. R. App. P. 8, at 12-15. We do not believe that the Free Exercise Clause of the U.S. Constitution provides less protection against religious discrimination in Vermont than it does in Montana or that Vermont has a greater interest in refusing to fund religious education than Montana does. The Supreme Court's decision in *Espinoza* applies to all states. Moreover, French offers no evidence for the proposition that Vermont—uniquely among the states—has a "historic and substantial tradition" of refusing to fund religious education in the context of programs such as the TTP. *Espinoza*, 140 S. Ct. at 2258 (internal quotation marks omitted). He relies exclusively on *Chittenden Town*, which described a historic tradition in Vermont of avoiding only "public support of churches and ministers." *Chittenden Town*, 738 A.2d at 553.

Considering this background, the district court was wrong to allow the school districts to continue to withhold TTP funds from the petitioners while the districts developed new restrictions and safeguards. Not only did this decision ensure that the petitioners would continue to be denied access to generally available public benefits for an indefinite period of time; it also subjected the petitioners to an additional burden resulting from the school districts' prior status-based discrimination. Due to the district court's circumscribed preliminary injunction, the petitioners' tuition payments would be delayed while the school districts developed new use-based restrictions and then further delayed while Rice figured out how to comply with the yet-to-be-developed restrictions. Rather than "prevent … any further perpetration of injury" pending an adjudication on the merits, *Benson*, 168 F.2d at 696, the district court ensured that the petitioners would remain injured by the school districts' prior unconstitutional discrimination. That decision "cannot be located within the range of permissible decisions." *Manzano*, 945 F.3d at 625.

## III

Finally, we are "satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381. The petitioners have been deprived of a public benefit as a result of the state's and the school districts' decades-long policy of unconstitutional religious discrimination. The AOE and the school districts maintained this policy even after the Supreme Court squarely held that such discrimination violates the Free Exercise Clause. In these circumstances, the respondents' desire to adhere to *Chittenden Town* must give way to the petitioners' entitlement to be restored to the position they would have occupied had the government not violated

19

their rights under the First Amendment to the U.S. Constitution. *See* U.S. Const. art. VI, cl. 2 (providing that the U.S. Constitution "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding").

* * *

For these reasons, we granted the petition for a writ of mandamus. At this point, the individual petitioners are entitled to TTP funding to the same extent as parents who choose secular schools for their children, regardless of Rice's religious affiliation or activities.

In the interest of judicial economy, any further appeals shall be referred to this panel. *See De La Rosa v. Holder*, 598 F.3d 103, 105 (2d Cir. 2010); *Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*, 214 F.3d 132, 135-36 (2d Cir. 2000).[8]

---

[8] We also now deny the petitioners' and the school districts' motions to supplement the record, filed on February 3 and 5, 2021. The motions contain evidence of measures the AOE and the school districts took to implement adequate safeguards after the district court issued its opinion. These measures, which the petitioners' motion brought to our attention before we issued our order, did not impact our decision or cause us to reconsider it. We also deny French's motion to supplement the record, filed on February 17, 2021.

MENASHI, *Circuit Judge*, concurring:

As the court's opinion explains, the district court failed to provide the petitioners with the relief to which they were entitled, and we therefore granted mandamus. I write separately to note two additional reasons why mandamus was appropriate.

**I**

First, the district court denied relief to the petitioners based on its own determination that religion so pervasively affected the mission and curriculum at Rice Memorial High School ("Rice") that the school districts were justified in worrying that funding such a school would violate the Vermont constitution. *A.H. ex rel. Hester v. French* (*French I*), No. 2:20-CV-151, 2021 WL 62301, at *5 & n.5, *12-13 (D. Vt. Jan. 7, 2021). This decision—that the petitioners should be denied full preliminary injunctive relief because Rice's religious mission and curriculum justified extra precautionary measures—was itself status-based religious discrimination. The district court therefore rendered a decision that "cannot be located within the range of permissible decisions," supporting mandamus. *United States v. Manzano* (*In re United States*), 945 F.3d 616, 625 (2d Cir. 2019).

In ruling on the motion for a preliminary injunction, the district court considered the school districts' claim that "it would be difficult, if not impossible, to segregate religious education from secular courses" at Rice. *French I*, 2021 WL 62301, at *5. Earlier in the litigation, the school districts had asked the district court to take judicial notice of one page on Rice's website which indicated that "Faith" was the first of "The Four Pillars of Rice" and "is weaved into every aspect of life at Rice." App'x 331-32. The district court took notice not only of

this webpage but of Rice's entire website and analyzed pages describing Rice's mission and curriculum. *French I*, 2021 WL 62301, at *1, *5. Based on its review of this material, the district court concluded that Rice offers not only "secular educational courses" but also "religious education" and that, therefore, the school districts could not at that time be ordered to pay tuition to Rice in light of *Chittenden Town*. *Id.* at *5, *12.[1]

The district court's refusal to remedy the school districts' prior status-based discrimination was thus premised on its determination that religion pervaded Rice's mission and curriculum such that the school districts could not fund tuition at such a school without imposing extra precautionary measures. By conditioning access to a public benefit "on the degree of religiosity of the institution and the extent to which that religiosity affects its operations, as defined by such things as the content of its curriculum," a state actor "discriminates among religious institutions on the basis of the pervasiveness or intensity of their belief." *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008). "This is discrimination 'on the basis of religious views or religious status.'" *Id.* at 1258 (quoting *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990)). Therefore, the district court's reliance on its *sua sponte* assessment of Rice's mission

_____

[1] *See French I*, 2021 WL 62301, at *5 & n.5 ("[Rice] offers secular educational courses as well as courses offered by its 'Religion Department' including 'Scripture,' 'Catholic Faith and Sacraments,' 'Morality & Social Justice,' 'Catholicism Today,' 'Love and Life Choices,' and 'Art and Spirituality.' ... [T]hese materials remain relevant to the availability and scope of injunctive relief."); *id.* at *12 ("This court cannot simply order the School Defendants to honor Plaintiffs' [Rice] tuition requests. To do so would be to ignore ample evidence that at least some of the courses offered by [Rice] consists of religious education.").

and curriculum to support its decision exceeded "a lawful exercise of its prescribed jurisdiction." *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943).[2]

Before the district court, the school districts invoked a similar "pervasively sectarian" test to justify the petitioners' categorical exclusion from the TTP,[3] arguing that "[t]he Vermont Constitution … as interpreted in *Chittenden*, prohibits the use of public funds to advance religious worship, and it is *not possible* to safeguard against the use of those funds for that purpose given the sectarian nature of

---

[2] The district court denied the injunctive relief in an effort to allow the school districts to apply a use-based restriction. Yet "[s]tatus-based discrimination remains status based even if one of its goals or effects is preventing religious organizations from putting aid to religious uses." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2256 (2020) (holding that status-based discrimination against "some recipients, particularly schools that believe faith should permeate everything they do," cannot be justified by a concern that "[g]eneral school aid … could be used for religious ends" by those recipients) (internal quotation marks, alterations, and emphasis omitted); *see also A.H. ex rel. Hester v. French* (*French II*), 985 F.3d 165, 183 (2d Cir. 2021) (holding that *Espinoza*'s rule against status-based discrimination applies "[e]ven if [the government] was motivated by a desire to prevent the use of public funds for religious worship").

[3] Under the "pervasively sectarian" test, "no state aid at all [may] go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones." *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 755 (1976); *see also Meek v. Pittenger*, 421 U.S. 349, 365-66 (1975) ("Even though earmarked for secular purposes, 'when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission,' state aid has the impermissible primary effect of advancing religion."), *overruled by Mitchell v. Helms*, 530 U.S. 793 (2000). The Supreme Court has since rejected this test. *See Mitchell*, 530 U.S. at 829 (plurality opinion); *id.* at 837 (O'Connor, J., concurring in the judgment).

3

Rice's curriculum." App'x 310 (emphasis added). In the briefing before this court, however, French argues that neither his agency nor school districts currently rely on a pervasively sectarian test and that *Chittenden Town* does not require the exclusion of pervasively sectarian schools.[4]

Ironically, despite French's disavowal of a pervasively sectarian test, the district court's decision invites such a test. It assumes that a school district may require a school to separate "secular educational courses" from "religious education" so that the district may cover "only the cost of secular educational expenses." *French I*, 2021 WL 62301, at *5, *12. Such an approach would exclude "pervasively sectarian" schools—which (either according to the school's own self-description or in a school district's judgment) do not distinguish secular from religious activities. Yet "nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of [the Supreme] Court bar it." *Mitchell v. Helms*, 530 U.S. 793, 829 (2000) (plurality opinion). In particular, applying a "'pervasively sectarian' factor collides with our decisions that have prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity." *Id.* at 828.

## II

Second, the writ of mandamus is "appropriate under the circumstances," *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 381 (2004), not simply because the district court prioritized "the respondents' desire

---

[4] Appellee Daniel M. French's Response to Appellants' Emergency Motion for Injunction Pending Appeal Under Fed. R. App. P. 8, at 21 & n.6 [hereinafter French Opposition].

to adhere to *Chittenden Town*" over "the petitioners' entitlement to be restored to the position they would have occupied had the school districts not violated their rights under the First Amendment," *ante* at 19-20. In doing so, moreover, the district court relied on the questionable legal premise that the school districts could "fashion[] appropriate safeguards" to delineate use-based restrictions on TTP funding consistent with *Chittenden Town* and thereby cure the constitutional problem with the previous policy. *French I*, 2021 WL 62301 at *11-13 (internal quotation marks omitted). The district court apparently concluded that creating such restrictions would be straightforward and devoted little attention to whether those restrictions would be permissible, stating only that "[b]ecause *Chittenden Town* prohibits only religious use, it does not conflict with *Espinoza*." *Id.* at *11

Even a use-based restriction, however, would be subject to strict scrutiny if it applied specifically to religious schools or to religious conduct because such a restriction would "violate 'the minimum requirement of neutrality' to religion." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)). A policy "burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of the Lukumi*, 508 U.S. at 546. To survive such scrutiny the policy "must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id.* (internal quotation marks omitted). A state's "interest in separating church and State more fiercely than the Federal Constitution … 'cannot qualify as compelling'" because "[a] State's interest 'in achieving greater separation of church and State than is already ensured under the

5

Establishment Clause is limited by the Free Exercise Clause.'" *Espinoza*, 140 S. Ct. at 2260 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017)) (alteration omitted).

The Establishment Clause does not require Vermont to avoid funding religious education through the TTP. "[T]he Establishment Clause is not offended when religious observers and organizations benefit from neutral government programs." *Id.* at 2254. And "[a]ny Establishment Clause objection" to TTP funds supporting religious education would be "particularly unavailing because the government support makes its way to religious schools only as a result of [parents] independently choosing" specific schools for their children to attend. *Id.*; *see also Locke v. Davey*, 540 U.S. 712, 719 (2004) ("Under our Establishment Clause precedent, the link between government funds and religious training is broken by the independent and private choice of recipients."). At one point in its opinion, the district court suggested that the TTP was not based on parental choice because the governing statute "grants only a sending school board decision-making authority." *French I*, 2021 WL 62301, at *12 (citing 16 V.S.A. § 822(c)(2)). Yet the school board may provide TTP funds to an independent school only if the school is "selected by the parents or guardians of the student." 16 V.S.A. § 822(a). That the school district actually dispenses the funds does not mean that funding decisions are not attributable to parental choice.[5]

_____

[5] *See* Aaron Saiger, *Charter Schools, the Establishment Clause, and the Neoliberal Turn in Public Education*, 34 Cardozo L. Rev. 1163, 1198 (2013) ("It is not as if the vouchers in *Zelman* or the scholarship in *Witters* involved actual cash given to private parties, who then elected whether to send it on to the school in which they enrolled; the programs involved paperwork, not

6

To be sure, the Supreme Court has "recognized a 'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Espinoza*, 140 S. Ct. at 2254 (internal quotation marks omitted) (quoting *Locke*, 540 U.S. at 718). But that space is narrow. In order for a use-based exclusion to receive the less exacting scrutiny the Supreme Court applied in *Locke*, that exclusion must advance "a 'historic and substantial' state interest" or "tradition." *Id.* at 2257-58 (quoting *Locke*, 540 U.S. at 725). And *Espinoza* clarifies that, while there is "a 'historic and substantial' state interest in not funding the training of clergy," there is no comparable interest or tradition of states declining to aid religious education more broadly understood.[6]

French argues that "*Espinoza* never stated that 'vocational religious instruction' was the only 'distinct category of instruction' or 'essentially religious endeavor' that government need not fund

tender."); *see also Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002) (upholding a voucher program "where state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals"); *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 488 (1986) (upholding a scholarship program in which aid that "ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients").

[6] *Espinoza*, 140 S. Ct. at 2258 ("[N]o comparable 'historic and substantial' tradition supports [a state's] decision to disqualify religious schools from government aid. In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones. … Local governments provided grants to private schools, including religious ones, for the education of the poor. Even States with bans on government-supported clergy … provided various forms of aid to religious schools.") (quoting *Locke*, 540 U.S. at 725) (internal citations omitted).

without offending the Free Exercise Clause." French Opposition 17 (quoting *Locke*, 540 U.S. at 721, 725). Yet *Espinoza* did explain that only a "historic and substantial" tradition would allow a government to exclude religious conduct from generally available public benefits without satisfying strict scrutiny. *Espinoza*, 140 S. Ct. at 2257-58. And *Espinoza* provided an account of the historical record according to which there is no such tradition of excluding religious education at high schools. *Id.* Neither the district court nor the respondents have identified any evidence of a historic tradition of use-based restrictions or "adequate safeguards" surrounding religious education. French cites *Chittenden Town* as evidence of such a tradition. But that decision, issued in 1999, identified a historic state tradition only of avoiding "public support of churches and ministers." *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 553 (Vt. 1999).

Any new religious use-based restrictions on TTP funds would need to "advance interests of the highest order and ... be narrowly tailored in pursuit of those interests." *Church of the Lukumi*, 508 U.S. at 546 (internal quotation marks omitted). Yet the district court decided that the petitioners should wait for relief until the school districts developed such restrictions and relied on the school districts' ability to do so without recognizing the legal issues such new restrictions would raise.

The district court also assumed that the new restrictions could distinguish religious from secular uses of funds such that tuition could be "apportioned between secular and religious education." *French I*, 2021 WL 62301, at *5. But an evaluation of Rice's curriculum to determine which courses and activities qualified as "religious education"—including the district court's own such evaluation—would likely entail "intrusive judgments regarding contested

questions of religious belief or practice" and thereby raise additional concerns under the First Amendment. *Colo. Christian Univ.*, 534 F.3d at 1261; *see also Mitchell*, 530 U.S. at 828 ("[C]ourts should refrain from trolling through a person's or institution's religious beliefs.").

Thus, the district court's artificially limited preliminary injunction resulted from a misapprehension of the applicable legal standards and the ease with which the respondents could apply an alternative policy that restricted religious uses of TTP funds. For these additional reasons, mandamus is "appropriate under the circumstances." *Cheney*, 542 U.S. at 381.